## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM MCCLEESTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **CIVIL ACTION NO. 06-120J** |
| v. ) | |
| ) | **JUDGE GIBSON** |
| CAROL MACKEL, EUGENE ) | |
| RICKABAUGH, JOE SMOLKO, JOE ) | |
| GORSUCH, JAMES WILDEMAN, SUE ) | |
| OSBORN, DONALD RULLMAN, ) | |
| DENNIS YEAGER, WILLIAM A. ) | |
| GANNON, and JOHN P. SARIANO, JR., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

### SYNOPSIS

This matter comes before the Court on the Defendants' Partial Motion to Dismiss, which has been filed pursuant to Federal Rule of Civil Procedure 12(b)(6). Document No. 19. For the reasons that follow, the motion will be granted in part and denied in part.

### BACKGROUND

The Plaintiff, William McCleester ("McCleester"), and his wife, Dawn McCleester ("Dawn"), commenced this action on May 31, 2006, against the Department of Labor and Industry ("Department"), the Hiram G. Andrews Center ("Center"), Carol Mackel ("Mackel"), Eugene Rickabaugh ("Rickabaugh"), Joe Smolko ("Smolko"), Joe Gorsuch ("Gorsuch"), James Wildeman

1

("Wildeman"), Sue Osborn ("Osborn"), Stephen M. Schmerin ("Schmerin"), Dennis Yeager ("Yeager"), Donald Rullman ("Rullman"), William A. Gannon ("Gannon"), and John P. Sariano, Jr. ("Sariano"). Document No. 1. They pursued claims under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, which are actionable under 42 U.S.C. § 1983, claims under 42 U.S.C. § 1985(3), and claims arising under Pennsylvania law for intentional and/or negligent infliction of emotional distress, defamation, and loss of consortium. Document No. 1, pp. 10-19, ¶¶ 54-89. The Defendants filed a Motion to Dismiss on August 1, 2006. Document No. 4.

In a memorandum opinion and order dated July 16, 2007, the Court granted the motion in part. *McCleester v. Dep't of Labor & Indus.*, 2007 WL 2071616, 2007 U.S. Dist. LEXIS 51436 (W.D.Pa. July 16, 2007). The claims against the Department and the Center were dismissed with prejudice on the ground that they were barred by the Eleventh Amendment. *McCleester*, 2007 WL 2071616, at *5-7, 2007 U.S. Dist. LEXIS 51436, at *15-22. Since Schmerin was sued only in his official capacity as the Secretary of the Department, the claims against him were barred as well. *Id.*, 2007 WL 2071616, at *8, 2007 U.S. Dist. LEXIS 51436, at *22. The claims arising under Pennsylvania law were dismissed on the ground that they were barred by Pennsylvania's sovereign immunity statute. *Id.*, 2007 WL 2071616, at *8-9, 2007 U.S. Dist. LEXIS 51436, at *23-25. This determination was necessitated by the fact that the Pennsylvania claims brought by the McCleesters were not within the categories of cases for which the Pennsylvania Legislature has waived the defense of sovereign immunity.[1] 42 Pa.C.S. § 8522. These claims were dismissed with prejudice. *McCleester*, 2007 WL 2071616, at *8-9,

---

[1] The Pennsylvania statute defines a "Commonwealth party" as "[a] Commonwealth agency and any employee thereof, but only with respect to an act within the scope of his office or employment." 42 Pa.C.S. § 8501. The statute specifically enumerates nine categories of liability for which Pennsylvania has waived its sovereign immunity, and for which its employees may be held liable even for actions taken within the scope of their official duties. 42 Pa.C.S. § 8522. None of the claims asserted by the McCleesters in their original complaint fell within these categories. Document No. 1, pp. 14-19, ¶¶ 70-89.

2

16, 2007 U.S. Dist. LEXIS 51436, at \*22-25, 47.

McCleester's claims under the Due Process and Equal Protection Clauses were dismissed as to Osborn, Rickabaugh, Smolko, Gorsuch, Schmerin, Wildeman, Gannon and Sariano for failure to allege personal involvement on the part of those defendants. *Id.*, 2007 WL 207161, at \*9-16, 2007 U.S. Dist. LEXIS 51436, at \*26-46. His claims against Mackel, Rickabaugh, Smolko, Gorsuch and Osborn under § 1985(3) were dismissed on the ground that he had failed to allege membership in a "discrete and insular minority." *Id.*, 2007 WL 2071616, at \*14-15, 2007 U.S. Dist. LEXIS 51436, at \*41-45. McCleester was granted leave to file an amended complaint with respect to these claims.[2] *Id.*, 2007 WL 2071616, at \*16, 2007 U.S. Dist. LEXIS 51436, at \*46-47.

On August 3, 2007, McCleester filed an Amended Complaint against Mackel, Rickabaugh, Smolko, Gorsuch, Wildeman, Osborn, Rullman, Yeager, Gannon and Sariano. Document No. 18. Dawn McCleester is not listed as a plaintiff on the Amended Complaint, and the Court assumes that the reason for this omission is the earlier dismissal of her loss of consortium claim with prejudice. The Department, the Center and Schmerin are no longer defendants because the Court has already determined that the claims asserted against them in the original complaint were barred by the Eleventh Amendment. The Defendants filed a Partial Motion to Dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) on October 9, 2007. Document No. 19. This motion is currently pending before the Court and is, consequently, the subject of this memorandum opinion.

Because this matter comes before the Court on the Defendants' Partial Motion to Dismiss, the

---

[2] McCleester alleged that the Defendants had retaliated against him for succeeding in a "State Civil Service Commission suit." Doc. No. 1, p. 11, ¶ 56. He did not specifically rely on the First Amendment. Nevertheless, the Court construed this allegation as a claim arising under the First and Fourteenth Amendments. *McCleester v. Dep't of Labor & Indus.*, 2007 WL 2071616, at\*13-14, 2007 U.S. Dist. LEXIS 51436, at \*39-41 (W.D.Pa. July 16, 2007). This claim survived the Motion to Dismiss only as to Rullman and Yeager, since McCleester did not allege personal involvement on the part of the other defendants. *Id.*

3

allegations contained in the Amended Complaint are assumed to be true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179, 192 (2007). Federal Rule of Civil Procedure 8(a)(2) requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). McCleester's Amended Complaint must be evaluated in accordance with the lenient "notice pleading" standards applicable in federal court. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512-515, 122 S.Ct. 992, 997-999, 152 L.Ed.2d 1, 9-11 (2002). Although "heightened fact pleading of specifics" is not required in order for McCleester's Amended Complaint to survive the Defendants' Motion to Dismiss, the Amended Complaint must still contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929, 949 (2007).

According to the Amended Complaint, McCleester is an adult individual who resides in Tire Hill, Pennsylvania. Document No. 18, p. 2, ¶ 2. The Center is located in Johnstown, Pennsylvania. *Id.*, ¶ 3. Mackel, Rickabaugh, Smolko, Gorsuch, Wildeman, Osborn, Yeager, Rullman, Gannon and Sariano are all employed by the Center. *Id.*, pp. 2-3, ¶¶ 3-12. At all times relevant to this case, Mackel served as the Human Resource Manager, Rickabaugh served as a Facility Maintenance Manager 1, Smolko served as a Maintenance Instructor, Gorsuch served as the Utility Plant Supervisor, Wildeman served as the Director of Human Resources, Osborn served as a Clerk Typist 3, Yeager served as the Deputy Director, Rullman served as the Director, Gannon served as the Executive Director of the Office of Vocational Rehabilitation, and Sariano served as the Director of the Bureau of Human Resources. *Id.*

The Center is a comprehensive rehabilitation facility which provides educational, health, counseling and psychological services to disabled individuals. *Id.*, p. 3, ¶ 13. As of the filing of the

4

Amended Complaint, McCleester was fifty-four years old. *Id.*, pp. 3-4, ¶¶ 14. He had been an employee of the Commonwealth of Pennsylvania for over thirty years. *Id.* He served as the Center's Facilities Maintenance Manager for eleven years. *Id.* In that capacity, he was responsible for planning, organizing and directing the facility's maintenance. *Id.* This included plant maintenance, utility and heating maintenance, groundskeeping, housekeeping, and vehicle maintenance. *Id.* McCleester supervised one manager and between forty and fifty rank and file employees. *Id.* He was provided with a secretary, direct access to a computer, a fax machine, an intercom system, two mailboxes, keys to the entire facility, an air conditioned office, a cellular phone and a radio. *Id.* Prior to June 1, 2004, he had never received any form of discipline, nor had he received an unsatisfactory rating. *Id.* The Pennsylvania Facilities Managers Association named him Engineer of the Year for 1997-1998. *Id.*, p. 4, ¶ 17. He received the Outstanding Achievement Award for 2001-2002 for his work on an $8.3 million ESCO project. *Id.* At all times relevant to this case, McCleester was a civil service employee, which meant that he was not an at-will employee within the meaning of Pennsylvania law. *Id.*, ¶ 16.

McCleester was diagnosed with diabetes in May 1987. *Id.*, p. 5, ¶ 19. He uses an insulin pump to regulate his diabetes. *Id.*, ¶ 22. In August 1995, he was diagnosed with multiple sclerosis. *Id.*, ¶ 19. The symptoms of multiple sclerosis include pain, limb paralysis, muscle weakness, numbness, memory problems and fatigue. *Id.*, ¶ 20. These symptoms can be exacerbated by stress and heat. *Id.* McCleester also suffers from a hearing impairment. *Id.*, ¶ 19. He wears hearing aids in both ears and speaks with a loud voice. *Id.*, ¶ 23. Due to his medical problems, McCleester has to take medications such as Oxycontin. *Id.*, ¶ 21. He did not believe that it was a good idea to have narcotics on the Center's premises. *Id.* For this reason, he often traveled home throughout the workday in order to administer his medications. *Id.*

5

According to the Amended Complaint, Mackel attempted to prevent McCleester's promotion from Facilities Maintenance Manager 2 to Facilities Maintenance Manager 3 in 2001 or 2002. *Id.*, pp. 5-6, ¶ 24. Mackel was asked to file an application with the Department for a desk audit. *Id.* The purpose of the desk audit was to determine whether McCleester was eligible for the promotion. *Id.* Mackel never filed the application. *Id.* After requesting the desk audit from the Department on his own, McCleester was granted the promotion. *Id.* The promotion apparently placed McCleester one pay level above Mackel. *Id.*

Mackel subsequently devised a plan to have McCleester investigated and terminated. *Id.*, p. 6, ¶ 25. Rickabaugh, Smolko, Gorsuch and Osborn were included in the plan. *Id.* Rickabaugh, Smolko and Gorsuch were supervisors under McCleester who stood to gain promotions upon his termination. *Id.*, ¶ 26. Osborn was McCleester's secretary. *Id.*, ¶ 27. She was angry at McCleester because he had reprimanded her two brothers-in-law, both of whom had worked under him. *Id.* Mackel, Rickabaugh, Smolko, Gorsuch and Osborn had a meeting with Dr. Albert Reynolds ("Reynolds"), who was the Director of the Center. *Id.*, ¶ 28. They "duped" Reynolds into believing that a secret investigation of McCleester was necessary. *Id.* Reynolds proceeded to request that such an investigation be commenced. *Id.* Mackel recommended that Reynolds opt for the suspension and/or termination of McCleester rather than a form of "progressive discipline." *Id.*, ¶ 29. Rickabaugh, Smolko, Gorsuch and Osborn all concurred in Mackel's recommendation. *Id.*, ¶ 30.

Mackel, Rickabaugh, Smolko, Gorsuch and Osborn agreed to assist Reynolds in the investigation. *Id.*, p. 7, ¶ 31. In May 2004, they began to observe McCleester's work habits, including his use of computers and Commonwealth vehicles. *Id.*, ¶ 32. Although a Workplace Violence Incident Report was allegedly filed against McCleester by Samuel Cammarata ("Cammarata"), Cammarata

6

testified at a Civil Service Commission hearing that he had never filed such a report. *Id.*, ¶ 33. It was later discovered that Mackel had filed the report against McCleester in accordance with her "deceptive scheme" to effectuate his termination. *Id.* While the investigation was underway, McCleester was never warned that his performance was deficient, nor was he given any form of progressive discipline. *Id.*, ¶¶ 34-35. On various occasions, other employees of the Center had been given warnings, progressive discipline, and opportunities to improve their performance. *Id.*, ¶ 36. In accordance with the investigation, Osborn began to keep track of McCleester's departure times each evening. *Id.*, ¶ 37. Smolko, who was also involved in the investigation, reported his findings to Harrisburg personnel. *Id.*, ¶ 38. The identities of these individuals from Harrisburg are not known to McCleester. *Id.*

On June 1, 2004, McCleester was summoned to a "fact-finding" meeting that lasted from 10:15 A.M. through 3:00 P.M. *Id.*, p. 8, ¶ 40. During the course of the meeting, McCleester was not given any breaks, nor was he permitted to administer his medications. *Id.* He was not given access to any records for the purpose of explaining the complaints or reports against him. *Id.* Immediately after the meeting concluded, McCleester was escorted off of the Center's premises. *Id.* He was warned that he could not reenter the premises, and that he was not allowed to contact any employees of the Center. *Id.* Wildeman and Sariano permitted the meeting to occur in this manner despite the fact that McCleester needed to take breaks. *Id.*, ¶¶ 41-42.

McCleester was suspended from his job on June 7, 2004, pending a further investigation. *Id.*, ¶ 43. He was not permitted on Center grounds, nor was he permitted to contact any Center personnel. *Id.* On August 2, 2004, a second "fact-finding" meeting was held. *Id.*, ¶ 44. Rullman and Mackel both attended the meeting. *Id.* McCleester's need to travel home to administer his medications, and to vary his work hours accordingly, was characterized by Mackel, Rickabaugh, Smolko, Gorsuch and Osborn

7

as a violation of the Center's policies and theft of paid work time. *Id.*, ¶ 45. Rickabaugh and Smolko accused McCleester of stealing a digital camera, which was apparently "planted" inside of his vehicle. *Id.*, p. 9, ¶ 46. Rickabaugh, Smolko and Gorsuch accused McCleester of stealing other Center property. *Id.*, ¶ 47. Mackel, Rickabaugh, Smolko, Gorsuch and Osborn all described McCleester as mean spirited, vindictive and irrational. *Id.*, ¶ 48.

As a result of the accusations lodged against him, McCleester was terminated on August 17, 2004. *Id.*, ¶ 50. McCleester had already appealed his earlier suspension to the State Civil Service Commission ("Commission") on June 18, 2004. *Id.* He later added his discharge as an additional basis for pursuing an appeal. *Id.* The Commission conducted a seven-day hearing for the purpose of determining whether McCleester had been wrongfully discharged. *Id.*, ¶ 51. On June 30, 2005, the Commission reduced McCleester's termination to a fifteen-day suspension. Document No. 5-2, pp. 81-82. McCleester was awarded back pay and benefits. *Id.* The Department appealed to the Pennsylvania Commonwealth Court, which affirmed the Commission's decision on March 17, 2006. Document No. 5-3, pp. 2-14.

Pursuant to the Commission's determination, McCleester returned to work on August 1, 2005. Document No. 18, p. 9, ¶ 53. Before McCleester's return, Rullman and Yeager held a meeting with the Center's employees. *Id.*, p. 10, ¶ 54. The employees were instructed not to have contact with McCleester. *Id.* Rullman and Yeager also held a meeting with other division directors and staff members from McCleester's division. *Id.*, ¶ 55. It was determined that McCleester would not get his old job back. *Id.* When McCleester returned to work, his responsibilities were very restricted. *Id.*, ¶ 56. He reported to Yeager, who informed him that he was not permitted to have contact with other Center employees, that he had no supervisory authority over other employees, and that he was not to

8

be involved with the day-to-day operations of the Maintenance Division. *Id.*, ¶¶ 56-59. Yeager instructed McCleester to work strictly from 8:00 A.M. through 4:00 P.M. *Id.*, ¶ 60. In McCleester's presence, Yeager opined that the Commission's disposition of the appeal had done "psychological damage" to the employees of the Center. *Id.*, ¶ 61. Rullman, Wildeman and Gannon had actual knowledge of, and affirmatively acquiesced to, all of the instructions given to McCleester and the rest of the Center's employees. *Id.*, p. 11, ¶¶ 62-65. All of them agreed to abide by these instructions, and none of them did anything to correct, reverse or modify them. *Id.*

Upon his return, McCleester was given an eight by ten foot room to use as his "office." *Id.*, ¶ 66. The room had previously been used as a storage closet. *Id.* Since the room had no windows, it sometimes became excessively hot, with the temperature in excess of eighty-five degrees. *Id.* There was no air conditioning. *Id.* When McCleester requested a fan, Rullman and Yeager told him that he could not be provided with one unless he completed a "reasonable accommodation" form. *Id.* No form was filled out, however, because Carol Taylor ("Taylor") provided a fan for McCleester without the need for a formal request. *Id.* Taylor was McCleester's third supervisor within a three-month period. *Id.* For all intents and purposes, McCleester was isolated in this room with no work to do, unless Yeager decided to assign him a specific task. *Id.*, p. 12, ¶ 67.

Due to his exposure to excessive levels of heat, McCleester began to have frequent headaches and leg pain. *Id.*, ¶ 68. He experienced an increase in his blood sugar levels, which caused his multiple sclerosis and diabetes to exacerbate. *Id.* On December 20, 2005, Taylor gave him keys to both his office and other areas to which he needed access. *Id.*, ¶ 69. One day later, Yeager informed Taylor that McCleester was not permitted to have keys to the Center. *Id.*, ¶ 70. Thus, Taylor was required to retrieve the keys from McCleester. *Id.*

9

On January 11, 2006, McCleester was scheduled to make a presentation at a town meeting about the $8.3 million ESCO project, for which McCleester had previously been awarded the Outstanding Achievement Award. *Id.*, ¶ 71. Five minutes before the presentation was to begin, Yeager told Taylor that it would be "unforgivable" to let McCleester give the presentation. *Id.* Yeager indicated to Taylor that he would be embarrassed to be on the same stage as McCleester, and he asked her what kind of message she was trying to send. *Id.* Taylor had no choice other than to deny McCleester the opportunity to make the presentation. *Id.* Just two or three days later, Taylor was "relieved" of her duty to supervise McCleester. *Id.*

In an alleged effort to retaliate against McCleester for his successful appeal, Rickabaugh instructed employees to submit written statements to Wildeman indicating that they were afraid of McCleester. *Id.*, ¶ 72. They were specifically instructed to make these statements even if they did not have true fears. *Id.* Rickabaugh indicated that, with enough complaints, Wildeman would be able to remove McCleester from the Maintenance Division. *Id.* Rickabaugh, Gorsuch, Smolko and Osborn also distributed contact information for the State Employees Assistance Program ("SEAP"). *Id.*, p. 13, ¶ 73. They instructed the employees to report their fears about McCleester, even if such fears were not genuine, in order to have him removed from the Maintenance Division. *Id.*

McCleester's medical problems worsened, causing him to be hospitalized. *Id.*, ¶ 74. He was unable to work between February 13, 2006, and June 2006. *Id.* McCleester was ultimately forced into disability retirement in June 2007. *Id.* As a result of the Defendants' actions, McCleester has suffered damage to his reputation in both the workplace and the community. *Id.*, ¶ 75. McCleester has also been stigmatized by his prior suspension and termination. *Id.*, ¶ 76.

The Amended Complaint contains three counts. Count I appears to be based on violations of

10

the First and Fourteenth Amendments.[3] Document No. 18, pp. 14-19, ¶¶ 79-110. These claims are before the Court pursuant to 42 U.S.C. § 1983. Count II alleges a conspiracy actionable under 42 U.S.C. § 1985(3). *Id.* at pp. 19-22, ¶¶ 111-130. Count III alleges violations of the Equal Protection Clause of the Fourteenth Amendment, which are actionable under § 1983. *Id.* at pp. 22-24, ¶¶ 131-137.

In their Partial Motion to Dismiss, the Defendants seek the dismissal of the Amended Complaint in its entirety as to Rickabaugh, Smolko, Gorsuch and Osborn. Document No. 19, p. 1, ¶ 2. They seek the dismissal of all claims arising under § 1985(3). *Id.* at 2. The motion is more compartmentalized with respect to the constitutional claims. The Defendants ask the Court to dismiss the claims arising under the Equal Protection Clause as to Rickabaugh, Smolko, Gorsuch and Osborn. *Id.* They also seek the dismissal of McCleester's First Amendment claims as to Mackel, Rickabaugh, Smolko, Gorsuch, Osborn and Sariano. *Id.*

McCleester's Fourteenth Amendment claims, except for those based on the Equal Protection Clause, arise under the Due Process Clause.[4] Document No. 18, p. 14, ¶ 80. The Defendants seek the dismissal of McCleester's procedural due process claims as to Mackel, Rickabaugh, Smolko, Gorsuch, Osborn, Rullman, Yeager and Gannon. Document No. 19, p. 2. McCleester appears to base some of his Fourteenth Amendment claims on his "constitutional right" to maintain a good reputation. Document No. 18, pp. 17-18, ¶¶ 97-105. The Defendants ask the Court to dismiss such claims in their

---

[3] Count I also contains a brief reference to the Pennsylvania Constitution, but no specific provision is mentioned. It is not entirely clear whether McCleester purports to assert state constitutional claims in this case. If he intends to do so, such claims are not pleaded sufficiently to withstand the Defendants' Partial Motion to Dismiss. Moreover, he clearly bases all of Count I on 42 U.S.C. § 1983, which provides a remedy for violations of federal law (and not state law). *Eichelman v. Lancaster County*, 510 F.Supp.2d 377, 386 (E.D.Pa. 2007) ("A violation of state law does not, in itself, give rise to a § 1983 claim."). Thus, McCleester does not assert cognizable state constitutional claims in the Amended Complaint.

[4] Although the Amended Complaint uses the words "privileges and immunities," McCleester does not allege violations of the Privileges and Immunities Clause of the Fourteenth Amendment. *Saenz v. Roe*, 526 U.S. 489, 503-507, 119 S.Ct. 1518, 1526-1528, 143 L.Ed.2d 689, 704-706 (1999) (discussing the third component of the right to travel, which is protected by the Privileges and Immunities Clause of the Fourteenth Amendment).

11

entirety. Document No. 19, p. 2. McCleester alleges that Mackel, Rickabaugh, Smolko, Gorsuch and Osborn conspired to deprive him of his rights under the First and Fourteenth Amendments. Document No. 18, pp. 18-19, ¶¶ 106-110. The Defendants move for the dismissal of McCleester's Amended Complaint insofar as it alleges a conspiracy actionable under § 1983. Document No. 19, p. 2.

## DISCUSSION

### A. The Claims Under 42 U.S.C. § 1983

Count I of the Amended Complaint is brought pursuant to 42 U.S.C. § 1983. Document No. 18, pp. 14-19, ¶¶ 79-110. This count is broken into four parts, which will be discussed separately to the extent necessary to dispose of the instant motion. Part I alleges that the Defendants violated McCleester's procedural due process rights under the Fourteenth Amendment by conducting the June 1, 2004, "fact-finding" meeting in an unfair manner. *Id.*, pp. 14-15, ¶¶ 79-88. In Part II, McCleester avers that the Defendants violated his rights under the First and Fourteenth Amendments by retaliating against him for successfully appealing his discharge to the Commission. *Id.*, pp. 16-17, ¶¶ 89-96. Part III is based on alleged violations of the Due Process Clause because of the damage done by the Defendants to McCleester's reputation. *Id.*, pp. 17-18, ¶¶ 97-105. In Part IV, McCleester alleges that the violations of his constitutional rights resulted from a conspiracy between Mackel, Rickabaugh, Smolko, Gorsuch and Osborn. *Id.*, pp. 18-19, ¶¶ 106-110. Count III is based on alleged violations of the Equal Protection Clause of the Fourteenth Amendment.[5] *Id.*, pp. 22-24, ¶¶ 131-137. Although Count III does not specifically refer to § 1983, the Court understands McCleester's claims under the Equal Protection Clause to be brought thereunder, since § 1983 is the remedy provided by Congress for such constitutional violations.

---

[5] Count II of the Amended Complaint is based on 42 U.S.C. § 1985(3), which will be discussed in a later portion of this memorandum opinion.

12

All of McCleester's constitutional claims arise under the Fourteenth Amendment. The provisions of the First Amendment, of course, are applicable to the States only by virtue of the Due Process Clause of the Fourteenth Amendment. *Locke v. Davey*, 540 U.S. 712, 718, 124 S.Ct. 1307, 1311, 158 L.Ed.2d 1, 8 (2004). Although McCleester does not specify the provision of the First Amendment upon which he bases his retaliation claims, the Court understands such claims to be based on the Petition Clause. *Foraker v. Chaffinch*, 501 F.3d 231, 236-237 (3d Cir. 2007) (recognizing the Petition Clause as a source of constitutional protection for "formal petitions," which are "defined by their invocation of a formal mechanism of redress"). The Petition Clause is applicable to the States because of its incorporation within the Due Process Clause. *Tarpley v. Keistler*, 188 F.3d 788, 794, n. 4 (7th Cir. 1999).

Under the circumstances of this case, the Petition Clause protected McCleester's right "to petition the Government for a redress of grievances." U.S. CONST. amend I. Section 1 of the Fourteenth Amendment provides:

All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST. amend. XIV, § 1. Section 5 of the Fourteenth Amendment gives Congress the power to enforce, "by appropriate legislation," the substantive provisions contained in § 1. U.S. CONST. amend. XIV, § 5. Pursuant to this authority, as well as other constitutional sources of legislative jurisdiction, Congress has enacted § 1983, which provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the

deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.

Section 1983 does not create substantive legal rights. *Maher v. Gagne*, 448 U.S. 122, 129, 100 S.Ct. 2570, 2574, 65 L.Ed.2d 653, 661, n. 11 (1980). For this reason, a plaintiff cannot prevail in an action brought under § 1983 without establishing an underlying violation of federal law. *Collins v. City of Harker Heights*, 503 U.S. 115, 119, 112 S.Ct. 1061, 117 L.Ed.2d 261, 269 (1992) ("Although the statute provides the citizen with an effective remedy against those abuses of state power that violate federal law, it does not provide a remedy for abuses that do not violate federal law[.]"). Moreover, § 1983 "contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right." *Board of County Commissioners v. Brown*, 520 U.S. 397, 405, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626, 639-640 (1997) (internal quotation marks omitted).

At the outset, the Court notes that the Defendants concede that the Amended Complaint properly alleges violations of the Due Process Clause, the Petition Clause and the Equal Protection Clause. They move for the dismissal of Counts I and III only as to certain defendants, although they seek the dismissal of McCleester's "reputation" and conspiracy averments in their entirety. Document No. 19, p. 2. The Court's inquiry, of course, is limited to the matters raised in the pending motion.

Before addressing the specific counts in the Amended Complaint, the Court must explain some of the legal principles which are common to all of McCleester's § 1983 claims. Since all of McCleester's federal constitutional claims (including those arising under the Petition Clause) are based

14

on the Fourteenth Amendment, they are subject to the Fourteenth Amendment's "state action" requirement. The Due Process and Equal Protection Clauses of the Fourteenth Amendment do not apply to private entities. *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 172, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627, 637 (1972). Where a plaintiff bases his or her claims on the Fourteenth Amendment, § 1983's "under color" of state law requirement is coextensive with the Fourteenth Amendment's "state action" requirement. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 929, 102 S.Ct. 2744, 2749, 73 L.Ed.2d 482, 490 (1982) ("Similarly, it is clear that in a § 1983 action brought against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical."). Consequently, averments which sufficiently allege state action are likewise sufficient to establish that the relevant defendants acted under color of Pennsylvania law for purposes of § 1983, and vice versa.

Liability under § 1983 cannot be based solely on a theory of *respondeat superior*. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). In order to be held liable under § 1983, a defendant must have "personal involvement" in the relevant violations of federal law. *Id.* Such personal involvement can be shown by "allegations of personal direction or of actual knowledge and acquiescence." *Id.* These allegations must be made with "appropriate particularity." *Id.* A complaint adequately alleges personal involvement "where it states the conduct, time, place, and persons responsible" for the alleged violation of federal law. *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005). This requirement prevents liability under § 1983 for one's own official actions from collapsing into *respondeat superior* liability for the actions of others. *Parratt v. Taylor*, 451 U.S. 527, 537, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420, 429, n. 3 (1981)("Petitioners were not personally involved in the handling of the packages and respondent's basic allegation appears to be that subordinates of petitioners

15

violated established procedures which, if properly followed, would have ensured the proper delivery of respondent's packages. In the past, this Court has refused to accept § 1983 actions premised on theories of *respondeat superior*.").

In their Partial Motion to Dismiss, the Defendants seek the dismissal of the Amended Complaint in its entirety as to Rickabaugh, Smolko, Gorsuch and Osborn. Document No. 19, p. 1, ¶ 2. Their primary basis for doing so is the fact that McCleester affirmatively avers that these four individuals were his subordinates, who had no supervisory authority over him.[6] Document No. 20, pp. 8-11. Not every action taken by a state employee constitutes "state action." This is true even with respect to actions taken inside of the workplace. *Priller v. Town of Smyrna*, 430 F.Supp.2d 371, 377-378 (D.Del. 2006)(holding that a public employee's act of raping another public employee, inside of the workplace but during off-duty hours, did not constitute an act under color of state law); *Kohler v. City of Wapakoneta*, 381 F.Supp.2d 692, 710-711 (N.D.Ohio 2005)(holding that a chief of police did not act under color of state law when he placed a tape recorder inside of a women's restroom for the purpose of recording the sounds of a woman's excretory and urinary functions). In order to properly allege an abuse of state power by a public employee, a complaint must allege a nexus between the defendant's interaction with the plaintiff and the execution of that defendant's official duties. *Nadig v. Nagel*, 272 F.Supp.2d 509, 512 (E.D.Pa. 2003). Generally speaking, where a § 1983 action is brought by one public employee against another person employed by the same entity, "the alleged wrongdoer must occupy a supervisory position over the plaintiff" in order to act under color of state law. *Houlihan v.*

---

[6] The Court acknowledges that the Defendants advance this argument in the portion of their brief addressing McCleester's First Amendment claims. Document No. 20, pp. 8-11. Nonetheless, it is clear that they are basing their argument on § 1983's "under color" of state law requirement, which is common to all of McCleester's federal constitutional claims. Indeed, they specifically contend that the same analysis which applies to McCleester's First Amendment claims is equally applicable to his Equal Protection Clause claims. *Id.*, p. 20, n. 6. For this reason, the Court's discussion of the "under color" of state law requirement generally encompasses all of McCleester's federal constitutional claims.

16

*Sussex Technical Sch. Dist. Bd. of Educ.*, 461 F.Supp.2d 252, 261 (D.Del. 2006).

The question of whether a particular individual holds a "supervisory position" over another must be answered by reference to the power that the individual actually holds, not by reference to his or her formal job title. In *Bonenberger v. Plymouth Township*, 132 F.3d 20, 23 (3d Cir. 1997), the Third Circuit found "no plausible justification for distinguishing between abuse of state authority by one who holds the formal title of supervisor, on the one hand, and abuse of state authority by one who bears no such title but whose regular duties nonetheless include a virtually identical supervisory role, on the other." A *de facto* supervisor who lacks the power to terminate a subordinate's employment may nevertheless abuse his or her power with respect to that subordinate, and may even constructively discharge that subordinate, so long as he or she exercises *some* authority over him or her. *Hill v. Borough of Kutztown*, 455 F.3d 225, 240 (3d Cir. 2006). In determining whether a *de facto* supervisory relationship exists, a court must consider whether the defendant could alter the plaintiff's workload, or whether the plaintiff would face internal charges of insubordination for failing to adhere to the defendant's instructions. *Zelinski v. Pennsylvania State Police*, 108 Fed.Appx. 700, 703 (3d Cir. 2004) (not precedential). The issue of supervisory authority is a question of fact. *Beattie v. Guilderland Cent. Sch. Dist.*, 124 F.Supp.2d 802, 806-807 (N.D.N.Y. 2000) (denying summary judgment on the ground that actual authority was in dispute).

The Amended Complaint affirmatively avers that Rickabaugh, Smolko and Gorsuch worked under McCleester's supervision. Document No. 18, p. 6, ¶ 26. Although they were supervisors themselves, McCleester was their supervisor. *Id.* The Amended Complaint also states that Osborn was McCleester's secretary. *Id.*, ¶ 27. Implicit in this averment is an allegation that McCleester was Osborn's immediate supervisor. The Defendants contend that these averments preclude a finding that

17

Rickabaugh, Smolko, Gorsuch and Osborn acted "under color" of Pennsylvania law with respect to McCleester. Document No. 20, pp. 8-11. For this reason, they move for the dismissal of all federal constitutional claims asserted against these four individuals. Document No. 19, p. 1, ¶ 2.

The "state action" issue is not as simple as the Defendants suggest. While the existence or lack of a supervisory relationship between a defendant and a plaintiff in a § 1983 action informs the inquiry as to whether the defendant acted "under color" of state law, its absence is not a complete bar to § 1983 liability. The essence of § 1983's "under color" of law requirement is merely that "the alleged offender, in committing the act complained of, abused a power or position granted by the state." *Bonenberger*, 132 F.3d at 24. Even a private party may be liable under § 1983 so long as he has "jointly engaged with state officials" in a prohibited action. *Dennis v. Sparks*, 449 U.S. 24, 27-28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185, 189 & n.4 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1152, 1156, 16 L.Ed.2d 267 (1966); *United States v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 1156, 16 L.Ed.2d 267 (1966)). If even a completely private party may be liable, the Court can see no reason why a subordinate who conspired with a state actor to deprive a superior of a federal right would be shielded from liability by his subordinate status.

The Amended Complaint includes conspiracy averments against Mackel, Rickabaugh, Smolko, Gorsuch and Osborn. Document No. 18, pp. 18-19, ¶¶ 106-110. The Defendants have moved for the dismissal of McCleester's conspiracy averments on the ground that there is no underlying federal claim to sustain conspiracy liability under § 1983. Document No. 20, pp. 13-16. They argue that, to be actionable, a conspiracy must be tied to, or derivative of, an actual constitutional violation. *Id.*, p. 15. The Court agrees with this argument in a general sense. Nevertheless, the Defendants appear to be cherry-picking portions of the Amended Complaint without reading it in its entirety.

18

It is clear that McCleester alleges that Mackel, Rickabaugh, Smolko, Osborn and Gorsuch conspired to violate his rights under the Petition Clause, the Due Process Clause and the Equal Protection Clause. Document No. 18, p. 18, ¶ 107. The conspiracy averments are not confined to a single issue, as the Defendants apparently believe. Document No. 20, p. 15. According to the Amended Complaint, the five conspirators met with Reynolds to recommend that McCleester be suspended and terminated without the benefit of progressive discipline. Document No. 18, p. 15, ¶ 85. McCleester avers that other Center employees would have been afforded the opportunity for progressive discipline under similar circumstances. *Id.* This averment supports some of his claims under the Equal Protection Clause. *Id.*, p. 23, ¶ 134. The Court acknowledges that Mackel is not specifically mentioned in the averment concerning the efforts of Rickabaugh, Smolko, Osborn and Gorsuch to encourage Center employees to make false allegations against McCleester to the SEAP. *Id.*, p. 17, ¶ 96. Nonetheless, this allegation must be read in light of McCleester's averment that the five conspirators (including Mackel) conspired to violate his First Amendment rights. *Id.*, p. 18, ¶ 107. Moreover, the conspiracy is alleged to have included attempts to damage McCleester's reputation. *Id.*, p. 19, ¶ 108. The Court notes that, before specifying the particular bases for each cause of action, McCleester incorporated by reference all of his prior averments. *Id.*, pp. 14, ¶ 79, 16, ¶ 89, 17, ¶ 97, 18, ¶ 106, 20, ¶ 111, 23, ¶ 131. McCleester obviously intends for each portion of the Amended Complaint to be read within the context of the entire situation. Document No. 21, pp. 7-10. It must be remembered that the Amended Complaint must be evaluated in accordance with the lenient "notice pleading" standards applicable in federal court. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512-515, 122 S.Ct. 992, 997-999, 152 L.Ed.2d 1, 9-11 (2002). Federal Rule of Civil Procedure 8(a)(2) requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is

19

entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). That standard is met here. "This is not a case in which the complaint contains conclusory allegations of concerted action but is devoid of facts actually reflecting joint action." *Abbott v. Latshaw*, 164 F.3d 141, 148 (3d Cir. 1998). Since this issue is presented within the context of the Defendants' Partial Motion to Dismiss, the Court must construe the allegations contained in the Amended Complaint in the light most favorable to McCleester. *Christopher v. Harbury*, 536 U.S. 403, 406, 122 S.Ct. 2179, 2182, 153 L.Ed.2d 413, 418-419 (2002).

The foregoing discussion, of course, does not mean that the Amended Complaint necessarily states a valid conspiracy claim with respect to each alleged constitutional violation. The extent to which each alleged violation is amenable to conspiracy claims in this case will be discussed later in this opinion. At this point, the Court's discussion of McCleester's conspiracy averments is limited to the question of whether the Amended Complaint properly alleges a conspiracy that was tied to, or derivative of, an actual violation of the Constitution.

McCleester's four subordinates could not have acted under color of Pennsylvania law in their own right, since they had no supervisory authority over McCleester. Consequently, for purposes of this case, they were private actors despite the fact that they were state employees. That does not mean, however, that they could not have acted under color of Pennsylvania law for purposes of § 1983, or that their actions could not have constituted "state action" for purposes of the Fourteenth Amendment. They can still be held liable under § 1983 for conspiring with a state actor to deprive McCleester of federally protected rights. *See Williams v. Seniff*, 342 F.3d 774, 785 n. 8 (7th Cir. 2003) (citing *Dennis*, 449 U.S. at 28-29, 101 S.Ct. 183, 66 L.Ed.2d 185; *Tarkowski v. Robert Bartlett Realty Co.*, 644 F.2d 1204, 1206 (7th Cir. 1980)).

In order to hold a private actor liable under § 1983 on the basis of a conspiracy, a plaintiff must

20

establish that the private defendant somehow reached an "understanding" with at least one state actor to deprive the plaintiff of a federally protected right. *Kost v. Kozakiewicz*, 1 F.3d 176, 185 (3d Cir. 1993). There must be a nexus between the state defendant and the actions of the private defendant such that the private defendant may be fairly deemed to be a state actor for purposes of the relevant violation. *Limehouse v. State of Delaware*, 144 Fed.Appx. 921, 923 (3d Cir. 2005) (not precedential). This nexus exists when a private individual is "a willful participant in joint activity with the State or its agents."[7] *United States v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267, 272 (1966). One who is coerced to participate in a conspiracy cannot be fairly characterized as a *willful* participant. For this reason, the United States Court of Appeals for the Third Circuit has observed that "compelled participation by a private actor may fall outside of the contours of state action." *Harvey v. Plains Township Police Department*, 421 F.3d 185, 195 (3d Cir. 2005). With that in mind, the Court now turns to the specific claims at issue.

## The Procedural Due Process Claims Concerning the June 1, 2004, "Fact-Finding" Meeting

McCleester alleges that, during the June 1, 2004, "fact-finding" meeting, he was denied access to food, water and medication for a period of five hours. Document No. 18, p. 15, ¶ 82. He avers that this deprivation of food, water and medication inhibited his ability to participate in the meeting in a meaningful way. *Id.*, ¶ 83. He states that Wildeman and Sariano agreed to conduct the meeting in this

---

[7] McCleester alleges that Mackel, Rickabaugh, Smolko, Gorsuch and Osborn "duped" Reynolds into believing that an investigation into McCleester's work habits was necessary. Document No. 18, p. 6, ¶ 28. He does not contend that Reynolds was himself a part of the conspiracy. Indeed, Reynolds is not a defendant in this case. Thus, in order to hold his four subordinates liable under § 1983, McCleester must establish that they conspired with Mackel to violate his constitutional rights. For purposes of the instant motion to dismiss, the Court will assume that Mackel did in fact have some authority over McCleester and can therefore be considered a state agent. *See* Document No. 18 pp. 5-6 ¶ 24 (suggesting that Mackel had at least some authority over McCleester); Document No. 22 p. 22-22 (accepting that McCleester has made out an Equal Protection claim against Mackel after arguing that McCleester's subordinates could not be liable for such a violation since "they did *not* exercise any form of authority or professional control over plaintiff") (emphasis added).

21

manner, and that they failed to modify it in such a way as to comply with the Due Process Clause. *Id.*, ¶ 84. The Defendants concede that the Amended Complaint states procedural due process claims against Wildeman and Sariano, but they move for the dismissal of the procedural due process claims against Mackel, Rickabaugh, Smolko, Gorsuch, Osborn, Yeager, Rullman and Gannon. Document No. 19, p. 2. They base their argument on these eight defendants' lack of personal involvement in the alleged procedural due process violation (i.e., the unfair manner in which the fact-finding meeting was conducted). Document No. 20, pp. 6-7.

McCleester contends that he can pursue procedural due process claims against Mackel, Rickabaugh, Smolko, Gorsuch and Osborn on the ground that they conspired to convince Reynolds to suspend and terminate him without affording him the benefit of progressive discipline. Document No. 18, p. 15, ¶ 85. Although he acknowledges that these individuals did not participate in the unfair fact-finding meeting, he insists that their conspiracy *caused* him to be subjected to the deprivation of his rights under the Due Process Clause by setting in motion the events leading to the relevant constitutional violation. Document No. 21, pp. 10-11. In support of his argument, McCleester relies on *Johnson v. Duffy*, 588 F.2d 740 (9th Cir. 1978). In *Johnson*, the United States Court of Appeals for the Ninth Circuit explained:

> A person "subjects" another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made. Moreover, personal participation is not the only predicate for section 1983 liability. Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.

*Johnson*, 588 F.2d at 743-744 (citation omitted). The Ninth Circuit adhered to this standard in its

subsequent decision in *Arnold v. International Business Machines Corporation*, 637 F.2d 1350, 1355 (9th Cir. 1981). This "setting in motion" view of causation is not confined to the Ninth Circuit; other courts in the federal system have adopted an identical formulation. *See, e.g., Waddell v. Forney*, 108 F.3d 889, 894 (8th Cir. 1997) (citations omitted); *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 560-61 (1st Cir. 1989) (citations omitted); *Russo v. United States*, 37 F.Supp.2d 450, 454 (E.D. Va. 1999) (citations omitted); *Peck v. United States*, 470 F.Supp. 1003, 1008 (S.D.N.Y. 1979) (citations omitted).

At first glance, the reasoning of *Johnson* and *Arnold* may appear to be contrary to the reasoning employed by the Third Circuit in *Rode v. Dellarciprete*, 845 F.2d 1195 (3d Cir. 1988), and *Evancho v. Fisher*, 423 F.3d 347 (3d Cir. 2005). In those decisions, the Third Circuit noted that a defendant in a civil rights action must have personal involvement in the alleged constitutional violations. *Rode*, 845 F.2d at 1207; *Evancho*, 423 F.3d at 353. In both instances, however, the Third Circuit was referring to situations in which plaintiffs were pursuing § 1983 claims against superior officials who did not directly *cause* the alleged violations. *Rode*, 845 F.3d at 1208 ("Further, Rode failed to show that the Governor had the necessary personal knowledge to sustain the civil rights action as to him."); *Evancho*, 423 F.3d at 353 ("Her amended complaint likewise does not contain even a remote suggestion that Attorney General Fisher had contemporaneous, personal knowledge of her transfer and acquiesced in it."). Thus, in *Rode* and *Evancho*, the Third Circuit simply reiterated the Supreme Court's admonition that liability under § 1983 cannot be based on a theory of *respondeat superior*. *Parratt v. Taylor*, 451 U.S. at 537, 101 S.Ct. at 1913, 68 L.Ed.2d at 429, n. 3 (citations omitted). It did not purport to establish a standard for deciding the issue of *proximate causation* in § 1983 actions.

In *Williams v. Pennsylvania State Police*, 144 F.Supp.2d 382 (E.D.Pa. 2001), the United States

23

District Court for the Eastern District of Pennsylvania noted the difference between the issue addressed by the Third Circuit in *Rode* and that discussed by the Ninth Circuit in *Johnson* and *Arnold*. *Williams*, 144 F.Supp.2d at 384 ("Therefore, I do not believe that the observations of the court of appeals in *Rode* are controlling in this context, where the question is not whether a supervisor could be responsible for the actions of her subordinates, but whether there is a sufficient nexus between the actions of an individual and an alleged constitutional wrong."). Finding a lack of authority from the Third Circuit on the issue, the District Court adopted the reasoning of the Ninth Circuit in *Johnson* and *Arnold* and held that causation in a § 1983 action may be established against an individual defendant in either of two ways: "(1) with evidence of direct personal involvement in the alleged constitutional violation by the defendant, or (2) with evidence that the defendant set in motion a series of acts by others that the defendant knew or reasonably should have known would cause others to inflict the constitutional injury." *Id.* at 384. In so holding, the District Court specifically rejected the idea that a defendant in a § 1983 action must be personally involved in the unconstitutional act itself in order to *proximately cause* that act to occur. *Id.*, n. 3.

Since the reasoning of the District Court in *Williams* was grounded in both the statutory language of § 1983 and a careful examination of the language employed by the Third Circuit in *Rode*, this Court finds such reasoning to be persuasive, and notes that it is not alone in its assessment. *See Pilchesky v. Miller*, 2006 WL 2884445, at *4-5, 2008 U.S. Dist. LEXIS 73681, at *14-15 (M.D. Pa. Oct. 10, 2006). Hence, the Court agrees with McCleester's argument that the causation standard enunciated by the Ninth Circuit in *Johnson* should be applied in this case. Document No. 21, pp. 10-11. It does not follow, however, that all ten of the Defendants *proximately caused* the procedural due process violation alleged in the Amended Complaint. Under the applicable causation standard, McCleester

24

must allege that each defendant "set in motion a series of acts by others that the defendant *knew* or reasonably *should have known* would cause others to inflict the *constitutional injury.*" *Williams*, 144 F.Supp.2d at 384 (emphasis added). For purposes of this analysis, the "constitutional injury" was the fact-finding meeting which failed to comport with the requirements of the Due Process Clause.

The Defendants concede that the Amended Complaint states procedural due process claims against Wildeman and Sariano, since they are alleged to have had "actual knowledge" of the fact-finding meeting, and to have had "agreed to the manner in which the meeting was conducted[.]" Document No. 18, p. 15, ¶ 84. The allegations against Mackel, Rickabaugh, Smolko, Gorsuch and Osborn concern only a conspiracy to convince Reynolds to recommend McCleester's suspension and dismissal without the benefit of progressive discipline. *Id.*, ¶ 85. There is no allegation that the five purported conspirators specifically contemplated that McCleester's procedural due process rights would be violated by the deprivation of food, water and medication for a period of five hours. The causation standard applicable in § 1983 actions "is not satisfied by a showing of mere causation in fact." *Arnold*, 637 F.2d at 1355. It is, of course, true that the fact-finding meeting would not have occurred in any manner (let alone in an unconstitutional manner) had the five conspirators not spoken with Reynolds. The same could be said of the actions of whomever *hired* McCleester, since he would not have been subjected to the fact-finding meeting if he had not been an employee of the Center. Section 1983's causation standard is not analogous to the concept of "but-for" causation. *Brown*, 520 U.S. at 410, 117 S.Ct. at 1391, 137 L.Ed.2d at 643.

McCleester's failure to allege that the five conspirators specifically intended to *cause* (or reasonably should have known that their actions would *cause*) the unconstitutional fact-finding meeting is also relevant to the "under color" of law inquiry. Since Rickabaugh, Smolko, Gorsuch and Osborn

25

were private actors for purposes of this analysis, any § 1983 liability on their part must be grounded in a conspiracy theory. *Williams*, 342 F.3d at 785, n. 8. The Supreme Court's analysis in *National Collegiate Athletic Association v. Tarkanian*, 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988), makes it clear that the Court must look to the actual agreement between the conspirators rather than the unforeseen consequences of that agreement. *Tarkanian*, 488 U.S. at 197, 109 S.Ct. at 464, 102 L.Ed.2d at 488, n. 17 ("In this case there is no suggestion of any impropriety respecting the agreement between the NCAA and UNLV. Indeed the dissent seems to assume that the NCAA's liability as a state actor depended not on its initial agreement with UNLV, but on whether UNLV ultimately accepted the NCAA's recommended discipline of Tarkanian. In contrast, the conspirators in *Dennis* became state actors when they formed the corrupt bargain with the judge, and remained so through completion of the conspiracy's objectives."). Since the alleged conspiracy between Mackel, Rickabaugh, Smolko, Gorsuch and Osborn did not involve a specific intent to deprive McCleester of food, water and medication for the duration of the fact-finding meeting, McCleester's four subordinates could not have acted "under color" of Pennsylvania law for purposes of the procedural due process violation alleged in the Amended Complaint. The Court agrees with the Defendants' argument that conspiracy liability under § 1983 exists only where the conspiracy is tied to, or derivative of, the actual violation of federal law. Document No. 20, p. 15.

The Amended Complaint alleges that Rullman participated in a second fact-finding meeting on August 2, 2004, but it does not allege that he had anything to do with the unconstitutional meeting on June 1, 2004. Document No. 18, p. 15, ¶ 86. Only Wildeman and Sariano are alleged to have had "actual knowledge" of the first fact-finding meeting, and to have "agreed to the manner in which [it] was conducted[.]" *Id.*, ¶ 84. For this reason, Mackel, Rickabaugh, Smolko, Gorsuch, Osborn, Rullman,

26

Yeager and Gannon did not *cause* the procedural due process violation alleged in the Amended Complaint. The procedural due process claims against these eight defendants concerning the meeting of June 1, 2004, must be dismissed. Accordingly, the Court will grant the Defendants' Partial Motion to Dismiss with respect to the relevant procedural due process claims, thereby permitting McCleester to pursue such claims only against Wildeman and Sariano. Document No. 19, p. 2.

## The Petition Clause Claims

The Defendants concede that the Amended Complaint properly states Petition Clause claims against Wildeman, Gannon, Rullman and Yeager. They seek the dismissal of the Petition Clause claims against Sariano, Mackel, Rickabaugh, Smolko, Gorsuch and Osborn. *Id.* Having reviewed the Amended Complaint in detail, the Court notes that Sariano is not alleged to have taken any actions against McCleester *after* June 30, 2005, which was the date of the Commission's decision to order McCleester's reinstatement. Document No. 18, pp. 9-13, ¶¶ 52-78. Therefore, anything done by Sariano could not have been in retaliation for McCleester's successful appeal. The Court will dismiss the Petition Clause claim against Sariano.[8]

The First Amendment claims against Mackel, Rickabaugh, Smolko, Gorsuch and Osborn raise more complicated questions. McCleester alleges that Rickabaugh, Smolko, Gorsuch and Osborn instructed other employees to make false reports to the SEAP concerning both McCleester's "misbehavior" and their continued fear of him. *Id.*, p. 17, ¶ 96. Mackel is not mentioned in this portion of the Amended Complaint. Moreover, the averments concerning the efforts of Rickabaugh, Smolko,

---

[8] The Court is not sure whether McCleester is attempting to pursue a First Amendment claim against Sariano. Count I of the Amended Complaint is confusing in that while all ten of the Defendants are listed at the beginning of the count, not all are alleged to have engaged in the specific conduct upon which McCleester bases particular constitutional claims. Document No. 18, pp. 14-19, ¶¶ 79-110. For the sake of clarity, however, the Court will dismiss the First Amendment claim against Sariano to the extent that the Amended Complaint could reasonably be construed to assert such a claim.

27

Gorsuch and Osborn to retaliate against McCleester do not refer to Mackel. *Id.*, pp. 12-13, ¶¶ 72-73. The Court acknowledges that McCleester avers, in a general sense, that Mackel conspired with McCleester's four subordinates to deprive him of his First Amendment rights (as well as other rights protected by the Fourteenth Amendment, upon which McCleester bases his § 1983 claims). *Id.*, p. 18, ¶ 107. Nevertheless, even under the lenient notice pleading standard applicable in federal court, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corporation*, 127 S.Ct. at 1974. Conclusory allegations that a conspiracy existed for the purpose of violating the Petition Clause are insufficient to survive a motion to dismiss.

In his brief, McCleester argues that Mackel worked with Rickabaugh, Smolko, Gorsuch and Osborn to constructively discharge him. Document No. 21, pp. 11-13. The problem with this argument is that the Amended Complaint does not directly implicate Mackel in a conspiracy to *retaliate* against McCleester for his successful appeal to the Commission. McCleester apparently believes that Mackel's actions *caused* his First Amendment rights to be violated for purposes of the Ninth Circuit's analysis in *Johnson*. Indeed, the tone of his argument indicates that he is basing his Petition Clause conspiracy claims on the meeting that took place between Reynolds and the five conspirators before he was suspended. *Id.*, p. 12 ("One subordinate may not be able to overthrow a superior, but if a group of subordinates team up with the support of a manager, they can retaliate and oust a superior. In this case Defendants, Rickabaugh, Smolko, Osborn and Gorsuch teamed up with Defendant Manager Mackel to oust and overthrow McCleester by bringing unfounded accusations against him to McCleester's superior Dr. Albert Reynolds."). As noted earlier, however, the liability of private actors under § 1983 for conspiring with a state actor hinges on whether there was an *agreement* to violate a federal right enjoyed by the plaintiff, not on whether such a violation was an unforeseen consequence of the

28

conspiracy. *Tarkanian*, 488 U.S. at 197, 109 S.Ct. at 464, 102 L.Ed.2d at 488, n. 17. When Mackel and McCleester's four subordinates allegedly met with Reynolds, they could not have been conspiring to retaliate against McCleester for prevailing in an appeal that had not yet been filed. At that point, McCleester had not engaged in any activity protected under the Petition Clause. There is no "plausible" way (and perhaps no *conceivable* way) that the pre-termination conspiracy could have been based on a desire to *retaliate* against McCleester for succeeding in a *future* appeal.

Rickabaugh, Smolko, Gorsuch and Osborn allegedly retaliated against McCleester, but there is no averment linking such retaliation to Mackel. Document No. 18, pp. 12-13, ¶¶ 72-73, 17, ¶ 96. As McCleester's subordinates, these four defendants could not have acted "under color" of Pennsylvania law with respect to McCleester in their own right, since they had *no* supervisory authority over him. *Hill*, 455 F.3d at 240 ("A supervisor who lacks the power to terminate a subordinate's employment may nonetheless abuse his power with respect to that subordinate, and may even constructively discharge the subordinate, provided he (the supervisor) exercises *some* power over the employee.") (emphasis in original). In the absence of a supervisory relationship, a subordinate can act "under color" of state law with respect to a superior only by conspiring with a state actor for the purpose of violating a federally protected right of that superior. *Williams*, 342 F.3d at 785, n. 8. In order to do so, such a subordinate must reach an "understanding" with at least one state defendant to violate the superior's federal right. *Kost*, 1 F.3d at 185. Given that Mackel and the four subordinates could not have *understood* that their conspiracy would someday lead to *retaliation* against McCleester for prevailing in a *future* appeal, and since the Amended Complaint does not link the subsequent retaliatory actions of the four subordinates to Mackel, McCleester's Petition Clause claims against these

29

five individuals must be dismissed.[9] *Loftus v. Southeastern Pennsylvania Transportation Authority*, 843 F.Supp. 981, 987 (E.D.Pa. 1994) ("Parallel but independent action by separate actors does not import conspiracy.").

The Court will grant the Defendants' Partial Motion to Dismiss with respect to the First Amendment claims against Sariano, Mackel, Rickabaugh, Smolko, Gorsuch and Osborn. Document No. 19, p. 2. McCleester may proceed with his First Amendment claims against Wildeman, Gannon, Rullman and Yeager.

## The Equal Protection Clause Claims

In Count III of the Amended Complaint, McCleester asserts claims under the Equal Protection Clause of the Fourteenth Amendment against all ten Defendants. Document No. 18, pp. 22-24, ¶¶ 131-137. The Equal Protection Clause provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. The Supreme Court has held that the Equal Protection Clause limits the actions of executive officials as well as the permissible scope of legislative enactments. *Yick Wo v. Hopkins*, 118 U.S. 356, 373-374, 6 S.Ct. 1064, 1072-1073, 30 L.Ed.220, 227-228 (1886). The central purpose of this constitutional prohibition is "to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sioux City Bridge Company v. Dakota County*, 260 U.S. 441, 445, 43 S.Ct. 190, 191, 67 L.Ed. 340, 342 (1923). Discrimination against a particular individual (*i.e.*, discrimination against a "class of one") violates the Equal Protection Clause when it bears no rational relationship to any legitimate

---

[9] Although McCleester intimates in Count II that Mackel, Rickabaugh, Smolko, Gorsuch and Osborn may have entered into multiple conspiracies, he makes no mention of the First Amendment. Document No. 18, p. 20, ¶ 112. The Amended Complaint is totally devoid of allegations that the retaliatory actions taken by the four subordinates were directly related to their conspiracy with Mackel.

30

governmental interest. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564-565, 120 S.Ct. 1073, 1074-1075, 145 L.Ed.2d 1060, 1063-1064 (2000). Although McCleester does not specifically mention § 1983 in Count III of the Amended Complaint, as he does in Count I, his Equal Protection Clause claims are before the Court pursuant to § 1983. *Ottman v. City of Independence*, 341 F.3d 751, 756 (8th Cir. 2003).

The Defendants do not contest the sufficiency of the allegations supporting the Equal Protection Clause claims against Mackel, Wildeman, Sariano, Gannon, Rullman and Yeager. Document No. 19, p. 2. Instead, they move for the dismissal of Count III only as to Rickabaugh, Smolko, Gorsuch and Osborn. *Id.* Their *sole* basis for seeking this dismissal of the Equal Protection Clause claims against McCleester's four subordinates is their lack of supervisory authority over him. Document No. 20, p. 21. The Court finds their argument to be unconvincing. Thus, the Defendants' Partial Motion to Dismiss will be denied with respect to Count III.[10]

McCleester avers that his rights under the Equal Protection Clause were violated when he was suspended and terminated without the benefit of progressive discipline. Document No. 18, p. 23, ¶ 134. He clearly alleges that the conspiracy between Mackel, Rickabaugh, Smolko, Gorsuch and Osborn was designed to cause this particular constitutional violation. *Id.*, p. 19, ¶ 109. The Amended Complaint, which must be construed in the light most favorable to McCleester, appears to allege that Mackel had some degree of control over McCleester. *Id.*, pp. 5-6, ¶ 24. The Court notes that the Defendants are not seeking the dismissal of Count III as to Mackel. Document No. 19, p. 2. The Amended Complaint

---

[10] The Court acknowledges that McCleester places some reliance on his subordinates' complaints to the SEAP to support his Equal Protection Clause claims. Document No. 18, p. 24, ¶ 137. As noted earlier, Rickabaugh, Smolko, Gorsuch and Osborn did not act "under color" of Pennsylvania law when they made such complaints. For this reason, McCleester's Equal Protection Clause claims cannot proceed against these four individuals on that basis. Nevertheless, McCleester can assert Equal Protection Clause claims against them in connection with their conspiracy with Mackel, which allegedly contemplated McCleester's suspension and discharge without the benefit of progressive discipline. *Id.*, p. 19, ¶ 109.

alleges a constitutional violation (i.e., arbitrary discrimination under the Equal Protection Clause) that was specifically intended to result from the *agreement* of the conspirators. *Tarkanian*, 488 U.S. at 197, 109 S.Ct. at 464, 102 L.Ed.2d at 488, n. 17. There is no suggestion that Rickabaugh, Smolko, Gorsuch and Osborn were not willful participants in the conspiracy. *Harvey*, 421 F.3d at 195. They are alleged to have reached an agreement with someone who could act under color of Pennsylvania law (i.e., Mackel) to deprive McCleester of his rights under the Equal Protection Clause. *Kost*, 1 F.3d at 185 ("As to the conspiracy claim against Gatti, appellants would be entitled to relief if they could show that Gatti and *at least one* of the state actors named as defendants in their complaint somehow reached an understanding to deny Ferri his rights under § 1983.") (emphasis added). These allegations are sufficient to sustain Count III as to Rickabaugh, Smolko, Gorsuch and Osborn notwithstanding the inability of these four individuals to independently effectuate McCleester's suspension and discharge. *County Concrete Corp. v. Twp. of Roxbury*, 442 F.3d 159, 174 (3d Cir. 2006) (quoting *PBA Local No. 38 v. Woodbridge Police Dep't*, 832 F.Supp. 808, 832, n. 23 (D.N.J. 1993)) (recognizing civil conspiracy as "a vehicle by which § 1983 liability may be imputed to those who have not actually performed the act denying constitutional rights").

It is of no moment that, for purposes of the Court's § 1983 analysis, McCleester's four subordinates are considered to be private actors (despite their status as state employees). The Supreme Court has recognized that individuals with no employment relationship with the State can sometimes act "under color" of state law. *Dennis*, 449 U.S. at 27, 101 S.Ct. at 186, 66 L.Ed.2d at 189 ("As the Court of Appeals correctly understood our cases to hold, to act 'under color of' state law for § 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents."). The Court cannot accept the Defendants'

32

argument that subordinates can *never* act under color of state law with respect to their superiors, even when they conspire with state officials. To do so would lead to an absurd anomaly wherein persons not employed by any governmental entity would be liable under § 1983 for conspiring with state officials to violate someone's federally protected rights, while state employees would be shielded from liability for engaging in identical conduct merely because the victim happened to be their superior.

Because McCleester's four subordinates allegedly conspired with Mackel (who had some supervisory authority over McCleester) to violate the Equal Protection Clause, the Court will deny the Defendants' Partial Motion to Dismiss with respect to Count III. Document No. 19, p. 2. McCleester may proceed with his Equal Protection Clause claims against all ten of the Defendants, with the understanding that Rickabaugh, Smolko, Gorsuch and Osborn acted under color of Pennsylvania law only insofar as their actions were pursuant to their alleged conspiracy with Mackel.

### The Procedural Due Process Claims Concerning Harm to McCleester's Reputation

In their Partial Motion to Dismiss, the Defendants move for the dismissal of all claims based on the harm to McCleester's reputation allegedly caused by their actions. Document No. 19, p. 2. Such claims are asserted against all ten of the Defendants. Document No. 18, p. 17, ¶ 99. Specifically, McCleester alleges damage to his reputation resulting from his subordinates' accusations that he stole equipment from the Center, his subordinates' instructions to other employees to make false reports to the SEAP, Mackel's recommendation that he not be afforded the opportunity for progressive discipline, the directives from Rullman and Yeager prohibiting contact between him and other Center employees, and Yeager's decision to prevent him from making a presentation about the $8.3 million ESCO project for which he had received the Outstanding Achievement Award. *Id.*, pp. 17-18, ¶¶ 100-105.

The Defendants state that McCleester does not assert a claim against Gannon under the Due

33

Process Clause concerning damage to his reputation. Document No. 20, p. 11. The Court disagrees with that observation, since the Amended Complaint mentions Gannon in a catch-all averment alleging that the Defendants' actions resulted in harm to McCleester's reputation. Document No. 18, p. 17, ¶ 99. McCleester alleges that Gannon had knowledge of, and affirmatively agreed to, all mandates concerning McCleester's interaction (or lack thereof) with other Center employees. *Id.*, p. 11, ¶ 65. McCleester's reputation-based averments incorporate that allegation by reference. *Id.*, p. 17, ¶ 97. Hence, the Court construes the Amended Complaint to assert a claim against Gannon under § 1983 for harm to McCleester's reputation.

The Defendants contend that these claims should be dismissed in their entirety. Document No. 20, pp. 11-13. Before addressing such claims as to specific individuals, the Court will briefly explain some general principles that will be applied to each defendant. McCleester's claims against the Defendants for damage to his reputation arise under the Due Process Clause of the Fourteenth Amendment. It is axiomatic that not every violation of state law violates the Due Process Clause. *Duffy v. County of Bucks*, 7 F.Supp.2d 569, 576 (E.D.Pa. 1998). The Supreme Court has consistently eschewed reliance on general principles of tort law in determining whether particular conduct by a state official violates the Fourteenth Amendment. *Daniels v. Williams*, 474 U.S. 327, 332-334, 106 S.Ct. 662, 665-667, 88 L.Ed.2d 662, 668-669 (1986)(noting the differences between the mandates of the Constitution and the requirements of state tort law); *Baker v. McCollan*, 443 U.S. 137, 146, 99 S.Ct. 2689, 2696, 61 L.Ed.2d 433, 443 (1976)(explaining that "false imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official"); *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251, 261 (1976)("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). This reluctance by the

34

Supreme Court to transform every tort by a state official actionable under state law into a constitutional violation is reflected in both its substantive and procedural due process jurisprudence. *County of Sacramento v. Lewis*, 523 U.S. 833, 848, 118 S.Ct. 1708, 1717, 140 L.Ed.2d 1043, 1059 (1998)("Thus, we have made it clear that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm."); *Davidson v. Cannon*, 474 U.S. 344, 348, 106 S.Ct. 668, 671, 88 L.Ed.2d 677, 683 (1986)("As we held in *Daniels*, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). The Supreme Court has repeatedly declined to "make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States." *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405, 413 (1976).

The theory relied upon by McCleester to support his reputation-based claims under the Due Process Clause can be traced to the Supreme Court's decision in *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). In *Constantineau*, referring to the Due Process Clause, the Supreme Court declared:

Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.

*Constantineau*, 400 U.S. at 437, 91 S.Ct. at 510, 27 L.Ed.2d at 519. However, consistent with its admonition that the Fourteenth Amendment is not a "font of tort law," the Supreme Court has construed the language in *Constantineau* to require more than mere defamation by a state official in order to constitute a deprivation of liberty or property within the meaning of the Due Process Clause. In *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), speaking through Justice Rehnquist, the Supreme Court explained that its precedents (including *Constantineau*) did "not establish the

35

proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul*, 242 U.S. at 701, 96 S.Ct. at 1161, 47 L.Ed.2d at 414. The phrase "because of what the government is doing to him," as used in *Constantineau*, was construed to refer to an alteration of one's status under state law. *Paul*, 424 U.S. at 708-709, 96 S.Ct. at 1164, 47 L.Ed.2d at 418 ("'Posting,' therefore, significantly altered her status as a matter of state law, and it was that alteration of legal status which, combined with the injury resulting from the defamation, justified the invocation of procedural safeguards."). While one's reputation *alone* does not constitute "liberty" or "property" within the meaning of the Fourteenth Amendment, a deprivation of a protected interest can nevertheless occur when state-occasioned defamation is coupled with an additional deprivation of a "more tangible interest." *Baraka v. McGreevey*, 481 F.3d 187, 208 (3d Cir. 2007). The United States Court of Appeals for the Third Circuit has referred to this inquiry as the "stigma-plus" test. *Hill v. Borough of Kutztown*, 455 F.3d 225, 236-239 (3d Cir. 2006).

In order to satisfy the "stigma" prong of the test, McCleester must first allege that the defamatory statements by state officials were made publicly. *Bishop v. Wood*, 426 U.S. 341, 348-349, 96 S.Ct. 2074, 2079-2080, 48 L.Ed.2d 684, 692-693 (1976). Second, he must allege that the defamatory statements were false. *Codd v. Velger*, 429 U.S. 624, 627-629, 97 S.Ct. 882, 883-885, 51 L.Ed.2d 92, 96-97 (1977). In order to satisfy the "plus" prong, he must aver that the defamation was accompanied by "the alteration of some governmentally recognized status[.]" *Doe v. United States Department of Justice*, 753 F.2d 1092, 1108, n. 15 (D.C.Cir. 1985). In this case, the relevant "plus" is a constructive discharge from a position in which McCleester possessed a constitutionally protected property interest. In a discharge case, a plaintiff need not establish that the defamation *caused* his or

36

her discharge. *Owen v. City of Independence*, 445 U.S. 622, 633, 100 S.Ct. 1398, 1406, 63 L.Ed.2d 673, 682, n. 13 (1980). It suffices to establish that he or she was defamed "incident to," or "in the course of," termination. *Id.*; *Siegert v. Gilley*, 500 U.S. 226, 234, 111 S.Ct. 1789, 1794, 114 L.Ed.2d 277, 288 (1991). When this occurs, it can be said that the state has "imposed on [the plaintiff] a stigma or other disability that forclose[s] his [or her] freedom to take advantage of other employment opportunities." *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548, 559 (1972). When such a *deprivation of liberty* occurs, the Due Process Clause requires the state to give the individual an opportunity to clear his or her name. *Roth*, 408 U.S. at 573, 92 S.Ct. at 2707, 33 L.Ed.2d at 558, n. 12.

In this case, the Defendants challenge the sufficiency of McCleester's allegations on several grounds. As an initial matter, they contend that he cannot pursue claims based on his liberty interest in maintaining a good reputation *because* he had a property interest in his job. Document No. 20, p. 12. This argument is wholly without merit and, in some ways, indicates that the Defendants are analyzing the issue backwards. There is no dispute in this case that McCleester had a property interest in his job. The Supreme Court has explained that a public employee who can be discharged only for cause has a property interest in remaining employed by the government. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538-539, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494, 501-502 (1985). Pennsylvania's Civil Service Act has consistently been construed to mean that a permanent civil service employee has a property interest in continued public employment. *Austin v. Neal*, 993 F.Supp. 444, 450 (E.D.Pa. 1996); *McAndrew v. State Civil Service Commission*, 736 A.2d 26, 30 (Pa.Commw.Ct. 1999); *City of Philadelphia v. Fraternal Order of Police*, 592 A.2d 779, 783 (Pa.Commw.Ct. 1991). Hence, there can be no doubt that McCleester had a property interest in continued employment, the

37

deprivation of which could constitutionally be occasioned only in accordance with due process of law.

The *presence* of a property interest, however, does not negate the possibility of a constitutionally protected liberty interest. The words "liberty" and "property," as they appear in the Fourteenth Amendment, have independent meanings. *Doe*, 753 F.2d at 1108, n. 15. Nonetheless, it does not follow that the terms are mutually exclusive, or that one who is deprived of a property interest cannot also be deprived of a liberty interest. Indeed, the United States Court of Appeals for the Third Circuit has acknowledged that, in some of its earlier decisions, it had intimated that one had no constitutionally protected liberty interest in maintaining a good reputation *without* an accompanying property interest. *Baraka*, 481 F.3d at 208 ("We have noted some confusion whether the additional 'more tangible interest' must be 'a protectible property interest,' or whether 'something less than a property interest, independently protected by the Due Process Clause, could be sufficient.'") (quoting *Ersek v. Township of Springfield*, 102 F.3d 79, 83, n. 5 (3d Cir. 1996)) (brackets omitted). In *Hill v. Borough of Kutztown*, 455 F.3d 225, 238 (3d Cir. 2006), the Court of Appeals clarified that "a public employee who is defamed in the course of being terminated or constructively discharged satisfies the 'stigma-plus' test even if, as a matter of state law, he lacks a property interest in the job he lost." While *Hill* opened the door for reputation-based due process claims brought by government employees who *lack* property interests in their jobs, it certainly did not close the door to such claims brought by government employees who *have* property interests in their jobs. It would be odd indeed if the "stigma-plus" test established in *Paul*, which emphasized the need for *more* tangible interests, was somehow narrowed to embrace only *less* tangible interests that cannot be equated with protected property interests. *Paul*, 424 U.S. at 701, 96 S.Ct. at 1161, 47 L.Ed.2d at 414. The Defendants' argument to the contrary turns the "stigma-plus" test into a "stigma-minus" test. Document No. 20, p.

38

12. The Court cannot accept the argument that the very interest which most often validates a reputation-based due process claim, *i.e.*, a property interest in continued employment, can simultaneously operate to defeat such a claim. The Court of Appeals' determination in *Hill* that a plaintiff can sometimes pursue a reputation-based due process claim in the *absence* of a property interest does not mean that the *presence* of a property interest is fatal to such a claim.[11] A contrary reading of *Hill* would obliterate the very logic upon which that decision rests. The Defendants' understanding of *Hill* is profoundly mistaken.

McCleester clearly alleges that some of the Defendants made false statements about him. Document No. 18, pp. 8-9, ¶¶ 45-48, 12-13, ¶¶ 72-73, 17, ¶ 100, 18, ¶¶ 102-104. Many of these statements, however, preceded the seven-day hearing that was held by the Commission. *Id.*, p. 9, ¶ 51. Moreover, some of the alleged defamatory statements occurred at the second fact-finding meeting, which was conducted on August 2, 2004. *Id.*, pp. 8-9, ¶¶ 44-48. Although McCleester avers that the first fact-finding meeting was conducted in an unconstitutional manner, he makes no similar allegation about the second fact-finding meeting. Since he was present at (and able to participate effectively in)

---

[11] It is, of course, true that a public employee who has a property interest in continued employment cannot constitutionally be deprived of that property interest without due process of law. Document No. 20, p. 12. It is also true that such an employee will normally be accorded the process that is due in connection with his or her reputation-based claim (i.e., an opportunity to clear his or her name) at the same hearing that satisfies the requirements of the Constitution with respect to the relevant deprivation of property (i.e., the pre-termination hearing). *Doe v. United States Dep't of Justice*, 753 F.2d 1092, 1108, n. 15 (D.C.Cir. 1985) ("Government employees who enjoy an independent property interest in continued employment, of course, must be afforded due process upon termination regardless of whether they are discharged in connection with stigmatizing allegations. That process will ordinarily afford those employees an opportunity to refute stigmatizing allegations."). The question of whether McCleester has been afforded "due process of law," however, has nothing to do with the "stigma-plus" test. The focus of the "stigma-plus" test is whether a plaintiff has a constitutionally protected liberty or property interest, not whether due process has been provided. *Siegert v. Gilley*, 500 U.S. 226, 234, 111 S.Ct. 1789, 1794, 114 L.Ed.2d 277, 288 (1991) (referring to "the lack of any constitutional protection for the interest in reputation"). Since most permanent civil service employees are likely to be accorded "due process of law" anyway, meritorious reputation-based due process claims by such employees may turn out to be relatively rare. That does not mean, however, that such an employee can never have a reputation-based claim, even when he or she is deprived of a genuine liberty interest (in accordance with the "stigma-plus" test) *without* due process of law. The argument raised by the Defendants conflates these two distinct inquiries. Document No. 20, p. 12.

the second fact-finding meeting, he was afforded "due process of law" insofar as he alleges deprivations of liberty or property interests in connection with the false allegations made against him at that meeting. *Id.*, p. 8, ¶ 44. Furthermore, the Commission's hearing gave him an opportunity to refute any false accusations which had been made against him during or prior to that hearing. Although McCleester's allegations concerning his original suspension and termination appear to satisfy the "stigma-plus" test, he was afforded the process that was due. The Due Process Clause does not prohibit all deprivations of liberty or property interests. Instead, it merely prohibits state-occasioned deprivations of such interests *without due process of law*. *Parratt*, 451 U.S. at 537, 101 S.Ct. at 1914, 68 L.Ed.2d at 430. To the extent that McCleester purports to rely on defamatory statements made in connection with his original suspension and termination, he alleges no violation of the Fourteenth Amendment. *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) (observing that the question of whether "due process of law" has been provided is separate from the question of whether the plaintiff has a constitutionally protected liberty or property interest in the first place).

The inquiry does not end there. McCleester alleges that, after his return to the Center, Yeager and Rullman prohibited him from having contact with other Center employees, and vice versa. Document No. 18, p. 18, ¶ 103. He also avers that Rickabaugh, Smolko, Gorsuch and Osborn directed other employees to make false accusations about him to the SEAP, and that he was not permitted to give a presentation about the ESCO project at a town meeting. *Id.*, ¶¶ 104-105. As noted earlier, McCleester makes no specific allegation linking the false reports made (and encouraged) by his four subordinates to their conspiracy with Mackel.

In order to satisfy the "stigma" prong of the "stigma-plus" test, McCleester must properly allege that defamatory statements about him were made "publicly." *Hill*, 455 F.3d at 236. In *Bishop v. Wood*,

40

426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), the Supreme Court observed that one cannot be stigmatized by a private comment (*i.e.*, a comment in which the person allegedly "stigmatized" is the only one to hear the comment). *Bishop*, 426 U.S. at 348, 96 S.Ct. at 2079, 48 L.Ed.2d at 692 ("In this case the asserted reasons for the City Manager's decision were communicated orally to the petitioner in private and also were stated in writing in answer to interrogatories after this litigation commenced. Since the former communication was not made public, it cannot properly form the basis for a claim that petitioner's interest in his 'good name, reputation, honor, or integrity' was thereby impaired."). Nevertheless, the Supreme Court did not precisely explain what it meant by the word "public." The meaning of this word has particular importance in this case, since the Defendants move for the dismissal of McCleester's reputation-based due process claims on the ground that he does not allege that any defamatory statements about him were made "publicly." Document No. 20, p. 13.

In cases involving merely a codified version of common law defamation, a defamatory statement made by one individual about another to a third person is generally considered to be a "public" statement. *See Nichols v. Moore*, 477 F.3d 396, 399 (6th Cir. 2007) (noting that, under Michigan law, a plaintiff need only establish that the defendant made an unprivileged, defamatory communication to a third party); *Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007) (explaining that, under Wisconsin law, a plaintiff must establish that the defamatory statement was "communicated by speech, conduct or in writing to a person other than the person defamed"); *Ruzicka Electric & Sons, Inc. v. International Brotherhood of Electrical Workers*, 427 F.3d 511, 522 (8th Cir. 2005) (using the term "publication" to refer to the communication element to a cause of action for defamation under Missouri law); Pa.C.S. § 8343(a)(2) (placing the burden of proof on the plaintiff in a defamation action to prove the defamatory statement's "publication"). While defamation law recognizes that the

41

communication of defamatory statements to a single recipient may minimize the damages to which a plaintiff may be entitled (since the damage to his or her reputation is rather minimal when only one person hears the defamatory statement), it nevertheless deems the "publication" element of the plaintiff's *prima facie* case to be satisfied when such a communication occurs. *Porter v. Joy Realty, Inc.*, 872 A.2d 846, 851, n. 8 (Pa.Super.Ct. 2005) ("We do not reach Appellees' contention regarding the lack of damages flowing solely from comments made to Ms. Dailey in light of our disposition which permits Porter's allegations regarding *publication* to other realtors to survive summary judgment.") (emphasis added). However, it is less clear whether a defamatory statement made to a single person (about someone other than the speaker or the recipient) can be "public" for purposes of *Bishop*.

Apparently inspired by the Supreme Court's holding that "[d]efamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation," *Siegert*, 500 U.S. at 233, 111 S.Ct. at 1794, 114 L.Ed.2d at 288, some courts have concluded that *Bishop* requires more than the publication of a defamatory statement to a single person. *See Eberhart v. O'Malley*, 17 F.3d 1023, 1028 (7th Cir. 1994) (explaining that, in order to deprive one of liberty, a defamatory statement must be "made public in a broader sense" than the "special meaning" given to the word "publication" by the general law of defamation); *see also Burton v. Town of Littleton*, 426 F.3d 9, 14-18 (1st Cir. 2005) (requiring that the stigmatizing charges be "intentionally publicized by the government . . . in a formal setting").[12]  Other courts have assumed that the stigma-plus test's "publication" requirement is

---

[12]  The Court notes that both *Eberhart*, 17 F.3d at 1028, and *Burton*, 426 F.3d at 17, focused on the effects of a defamatory discharge on an employee's future employment prospects. If the employee's liberty interest were limited to future employment a requirement that the defamatory material be more broadly disseminated would perhaps be reasonable and, indeed, in a case where only damage to future employment opportunities was alleged the Court would be inclined to consider whether an alleged publication could in fact have the claimed effect. However, an employment action also implicates the employee's liberty interest when it "is based on a 'charge against [the individual] that might seriously damage

42

somewhat analogous to that of the general law of torts. *See Willbanks v. Smith County*, 661 F.Supp. 212, 217-218 (E.D.Tex. 1987). It is not entirely clear which approach is more consistent with the Supreme Court's use of the term "public" in *Bishop*. After all, the facts in *Bishop* did not present an opportunity for the Supreme Court to elaborate on the question, since the reasons for the plaintiff's termination were communicated to him in *private* (*i.e.*, to *no* third parties), leading to the observation that the communication had not been *made public*. *Bishop*, 426 U.S. at 348, 96 S.Ct. at 2079, 48 L.Ed.2d at 692. Since *nobody* other than the plaintiff heard the reasons for his discharge, it was obvious that the relevant communication could not have formed the basis for a claim that his "good name, reputation, honor, or integrity" had been impaired. *Id.*

Although neither the Supreme Court nor the Court of Appeals for the Third Circuit has clearly explained the *extent* to which *Bishop* requires defamatory statements to be made "public," the Court has discovered some authority which suggests that the stigma-plus test's "publication" requirement may be similar to that applied by the general law of defamation. For instance, in *McKnight v. Southeastern Pennsylvania Transporation Authority*, 583 F.2d 1229, 1239 (3d Cir. 1978), the Court of Appeals determined that a complaint which alleged that defamatory statements had been "communicated to others," and that the plaintiff had suffered a loss of both reputation and job opportunities in the community, was sufficient to survive a motion to dismiss. In *Anderson v. City of Philadelphia*, 845 F.2d 1216 (3d Cir. 1988), the Court of Appeals apparently assumed *arguendo* that the stigma-plus test's "publication" requirement was akin to that of the general law of defamation when it stated as follows:

On the issue of publication, the plaintiffs cite in their brief several state court defamation cases holding that self-publication may meet a publication requirement

---

his standing and associations in the community . . ., for example, that he had been guilty of dishonesty, or immorality . . . ." *Robb v. City of Philadelphia*, 733 F.2d 286, 294 (3d Cir. 1984) (quoting *Roth*, 408 U.S. at 573, 92 S.Ct. at 2707). As discussed *infra*, even very limited dissemination of such charges could seriously damage an employee's reputation.

where the originator of the defamatory statement has reason to believe that the person defamed will be under a strong compulsion to disclose the defamation to *a third party*. Even assuming that this principle were applicable here, because the plaintiffs do not assert that they are under such a compulsion, we could not find the *publication* requirement thereby met.

*Anderson*, 845 F.2d at 1222, n. 5 (citation omitted; emphasis added). Finally, in *Mosca v. Cole*, 217

Fed.Appx. 158 (3d Cir. 2007), the Court of Appeals again hinted that the word "public" was used as

a term of art in *Bishop*, rather than in accordance with its ordinary meaning, by making the following

observation:

Mosca contends Langford, Fitzgerald, and the City deprived him of the liberty interest described in *Anderson* by disseminating the information that he was terminated for making aversion of the alleged comment that included the word "nigger." However, there is no evidence that Langford or Fitzgerald told anyone that Mosca was terminated for making the comment in any form, let alone one that apparently had not reached their ears at all. In fact, Mosca himself told a number of people about the alleged comment and stated to potential employers and eventually a newspaper that he believed it was the reason for his termination. Because there is no issue of fact as to whether Langford, Fitzgerald, or the City "published" the alleged remark, summary judgment was appropriate as to Mosca's due process claim.

*Mosca*, 217 Fed.Appx. at 163.

The implication left by the Court of Appeals' discussions in these decisions is that a defamatory statement is "made public" for purposes of *Bishop* when it is communicated to a single third party (*i.e.*, someone other than the speaker or the person defamed). Of course, defendants have been granted summary judgment in cases where no evidence of any dissemination of defamatory statements exists. *Copeland v. Phila. Police Dep't*, 840 F.2d 1139, 1148 (3d Cir. 1988); *Cooley v. Pa. Housing Fin. Agency*, 830 F.2d 469, 474-475 (3d Cir. 1987). Nevertheless, it does not follow that the stigma-plus test's "publication" requirement necessitates the disclosure of defamatory falsehoods to a large number of people. There is some authority to support the contention that such a falsehood is "made public" when it is communicated by the government to a single third party. *Willbanks*, 661 F.Supp. at 217-218

44

(noting that (1) "the harm to the employee's reputation is equally grave whether the stigmatizing allegation travels by word-of mouth or is revealed by press release" and that rumors are in fact "less susceptible to public refutation" than public pronouncements; and (2) since loss of employment is still "an essential element of the liberty interest claim" and the "stigma-plus" requirement is therefore preserved, employing the common law definition of publication does not impermissibly enlarge the scope of the constitutional tort to encompass all defamations by state actors). Consequently, the Court cannot credit the Defendants' apparent belief that McCleester must allege that defamatory statements about him were made to a large segment of the general population. Document No. 20, p. 13.

Assuming *arguendo* that the statements by Rickabaugh, Smolko, Gorsuch and Osborn to other Center employees satisfied the stigma-plus test's "publication" requirement, the Court notes that McCleester faces yet another hurdle. In order for his subordinates to act "under color" of Pennsylvania law, they had to conspire with a state actor (*i.e.*, somebody with a degree of supervisory authority over McCleester). *Williams*, 342 F.3d at 785, n. 8. The Amended Complaint contains a very general averment alleging that these four individuals conspired with Mackel to violate McCleester's constitutional rights, including his right to be free from deprivations of liberty without due process of law. Document No. 18, p. 18, ¶ 107. Nevertheless, there are no factual averments to support this generalization. The allegations do not specifically implicate Mackel in a conspiracy to have Center employees make false reports to the SEAP about McCleester. McCleester affirmatively avers that Rickabaugh's decision to urge other Center employees to make such fabricated allegations was made specifically to *retaliate* against McCleester for his *successful* appeal to the Commission. *Id.*, pp. 12-13, ¶¶ 72-73. When Mackel, Rickabaugh, Smolko, Gorsuch and Osborn met with Reynolds, they could not have had a conspiracy to *retaliate* against McCleester for prevailing in an appeal which had not yet

45

been filed.[13] The only plausible reading of the Amended Complaint is that Rickabaugh, Smolko, Gorsuch and Osborn acted alone when they decided to convince other employees of the Center to voice false concerns about McCleester to the SEAP. Since these four individuals were McCleester's subordinates, they could not have acted under color of Pennsylvania law when they took such actions. *Bonenberger*, 132 F.3d at 24 (recognizing that "not all torts committed by state employees constitute state action, even if committed while on duty"). Thus, McCleester's reputation-based due process claims against Rickabaugh, Smolko, Gorsuch and Osborn must be dismissed.

McCleester's remaining due process claims concern the directives from Rullman and Yeager prohibiting contact between him and other Center employees and Yeager's decision to prevent him from making a presentation. Document No. 18, p. 18, ¶¶ 103, 105. These allegations are deficient for a different reason. In *Codd v. Velger*, 429 U.S. 624, 627, 97 S.Ct. 882, 884, 51 L.Ed.2d 92, 96 (1977), the Supreme Court observed that "if the hearing mandated by the Due Process Clause is to serve any useful purpose, there must be some factual dispute between an employer and a discharged employee which has some significant bearing on the employee's reputation." Otherwise, the name-clearing hearing would be pointless. "Only if the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination is such a hearing required." *Codd*, 429 U.S. at 628, 97 S.Ct. at 884, 51 L.Ed.2d at 97. Since the decisions of Rullman and Yeager allegedly led to (or at least contributed to) McCleester's constructive discharge, such decisions can

---

[13] The Court acknowledges that the Amended Complaint includes an averment indicating that McCleester partially bases his conspiracy claims under 42 U.S.C. § 1985(3) on Rickabaugh's act of giving other Center employees contact information for the SEAP. Document No. 18, p. 21, ¶ 119. This averment, however, is contradicted by McCleester's own allegation that Rickabaugh took such action for the purpose of *retaliating* against him for prevailing in his appeal, which had not even been filed (or even necessitated, since no adverse action had been taken against McCleester) at the time that Rickabaugh, Smolko, Gorsuch, Osborn and Mackel entered into the alleged conspiracy. *Id.*, p. 12, ¶ 72. Although Rickabaugh allegedly received assistance from Smolko, Gorsuch and Osborn in his efforts to retaliate against McCleester, there is no specific allegation that Mackel was involved in fabricating false reports about McCleester to the SEAP. *Id.*, p. 13, ¶ 73.

46

fairly be said to have been made in *connection* with McCleester's termination. *Hill*, 455 F.3d at 26-27 (recognizing a constructive discharge as a "plus" for purposes of the stigma-plus test). Nevertheless, McCleester does not allege that Rullman and Yeager made defamatory statements about him (which he could have disputed at a name-clearing hearing) when they directed other Center employees not to have contact with him, or that Yeager made such statements when he convinced Taylor not to let McCleester make a presentation about the ESCO project. Document No. 18, pp. 10, ¶ 54, 12, ¶ 71. McCleester's failure to allege that Rullman and Yeager made false statements about him is fatal to his reputation-based due process claims against them. Such claims will be dismissed.

To the extent that McCleester asserts reputation-based due process claims against Mackel, Wildeman, Gannon and Sariano for conduct occurring after the Commission's decision to order his reinstatement, the Amended Complaint fails to provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corporation*, 127 S.Ct. at 1974. There are no specific averments tying these four individuals to defamatory statements. The Court will dismiss the reputation-based due process claims against them.

The Court is convinced that none of McCleester's reputation-based claims under the Due Process Clause state a claim upon which relief can be granted, and that the Defendants' Motion to Dismiss must be granted as to such claims. In so holding, the Court does not demean the importance of one's interest in maintaining a good reputation in his or her community. The people of Pennsylvania remain free to protect this interest, to a greater extent than they already have, by invoking the normal legislative process. In a case such as this, it must be remembered that "it is a *constitution* we are expounding." *McCulloch v. Maryland*, 17 U.S. 316, 407, 4 L.Ed. 579, 602 (1819) (emphasis added). "Our Constitution deals with the large concerns of the governors and the governed, but it does not

47

purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Daniels*, 474 U.S. at 332, 106 S.Ct. at 665, 88 L.Ed.2d at 669. The Amended Complaint's averments concerning harm to McCleester's reputation allege no violation of the Due Process Clause. To hold otherwise would be to "trivialize the centuries-old principle of due process of law." *Daniels*, 474 U.S. at 332, 106 S.Ct. at 665, 88 L.Ed.2d at 668.

## B. The Claims Under 42 U.S.C. § 1985(3)

In Count II of the Amended Complaint, McCleester alleges that Mackel, Rickabaugh, Smolko, Gorsuch and Osborn conspired to violate his right to "the equal protection of the laws," thereby necessitating redress under 42 U.S.C. § 1985(3). Document No. 18, pp. 19-22, ¶¶ 111-130. That statute provides:

(3) **Depriving persons of rights or privileges.** If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice-President, or as a member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

As an initial matter, "[s]ection 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." *Great American Savings & Loan Association v.*

48

*Novotny*, 442 U.S. 366, 372, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957, 964 (1979). The Amended Complaint satisfies this hurdle, since the Court has already concluded that McCleester properly alleges that Mackel, Rickabaugh, Smolko, Gorsuch and Osborn conspired to violate his rights under the Equal Protection Clause of the Fourteenth Amendment. Unlike § 1983, § 1985(3) has no "under color" of law element. *Griffin v. Breckenridge*, 403 U.S. 88, 92-101, 91 S.Ct. 1790, 1793-1798, 29 L.Ed.2d 338, 342-348 (1971). Where the actionable federal right underlying the conspiracy is itself assertable against private entities (such as a right arising under the Thirteenth Amendment or the right to interstate travel), a § 1985(3) plaintiff need not establish the existence of state action. *Griffin*, 403 U.S. at 104-107, 91 S.Ct. at 1799-1801, 29 L.Ed.2d at 349-351. However, where the underlying federal right is assertable only against governmental entities, a § 1985(3) plaintiff cannot prevail without establishing the requisite governmental action, which is an integral part of the actionable violation. *United Brotherhood of Carpenters & Joiners of America v. Scott*, 463 U.S. 825, 833, 103 S.Ct. 3352, 3358, 77 L.Ed.2d 1049, 1057 (1983). The Equal Protection Clause, of course, is applicable only to state actors. *Moose Lodge*, 407 U.S. at 172, 92 S.Ct. at 1971, 32 L.Ed.2d at 637. McCleester likewise satisfies this requirement, since the Court has already determined that the Amended Complaint properly alleges that the five conspirators engaged in state action with respect to the Equal Protection Clause claims.

The issues presented in this case can be traced to the Supreme Court's decision in *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). In *Griffin*, speaking through Justice Stewart, the Supreme Court declared that § 1985(3) was never "intended to apply to all tortious, conspiratorial interferences with the rights of others." *Griffin*, 403 U.S. at 101, 91 S.Ct. at 1798, 29 L.Ed.2d at 348. The Supreme Court explained:

49

The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all.

*Griffin*, 403 U.S. at 102, 91 S.Ct. at 1798, 29 L.Ed.2d at 348 (emphasis in original; footnotes omitted). Since its decision in *Griffin*, the Supreme Court has not significantly elaborated on the criteria for determining whether conspiracies resulting from nonracial, class-based animus are actionable under § 1985(3). Indeed, it has never recognized a nonracial class as a protected class under the statute. *Scott*, 463 U.S. at 836, 103 S.Ct. at 3360, 77 L.Ed.2d at 1059 ("In the first place, it is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause, most notably Republicans."). The most recent guidance provided by the Supreme Court concerning this question is its admonition in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269, 113 S.Ct. 753, 759, 122 L.Ed.2d 34, 46 (1993), that a class cannot be defined solely by reference to the conduct disfavored by the conspirators. Speaking through Justice Scalia, the Supreme Court explained:

Whatever may be the precise meaning of a "class" for purposes of *Griffin*'s speculative extension of § 1985(3) beyond race, the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors. Otherwise, innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with. This definitional ploy would convert the statute into the "general federal tort law" it was the very purpose of the animus requirement to avoid.

*Bray*, 506 U.S. at 269, 113 S.Ct. at 759, 122 L.Ed.2d at 46. While the question of whether § 1985(3) protects any nonracial classes has never been answered by the Supreme Court, the United States Court of Appeals for the Third Circuit has answered that question in the affirmative. In *Novotny v. Great Am.*

*Fed. Sav. & Loan Ass'n*, 584 F.2d 1235, 1242-1244 (3d Cir. 1978), overruled on other grounds by *Great Am. Sav. & Loan Ass'n. v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979),[14] the Court of Appeals concluded that conspiracies resulting from gender-based animus were actionable under § 1985(3). Similarly, in *Lake v. Arnold*, 112 F.3d 682, 687-688 (3d Cir. 1997), the Court of Appeals determined that conspiracies resulting from animus against mentally retarded individuals were actionable under § 1985(3).

In order to state a claim under § 1985(3), a plaintiff must allege: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Scott*, 463 U.S. at 828-829, 103 S.Ct. at 3356, 77 L.Ed.2d at 1054. There appears to be no dispute in this case as to the first, third and fourth elements to the cause of action. Thus, the Court's inquiry is limited to the second element, including the question of whether McCleester properly alleges that there was a "class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*, 403 U.S. at 102, 91 S.Ct. at 1798, 29 L.Ed.2d at 348. Consistent with this standard, McCleester "must allege both that the conspiracy was motivated by discriminatory animus against an identifiable class and that the discrimination against the identifiable class was invidious." *Farber v. City of Patterson*, 440 F.3d 131, 135 (3d Cir. 2006). Having reviewed Count II of the Amended Complaint in detail, the Court is convinced that McCleester fails to properly allege that the conspiracy was motivated by an animus against an identifiable class entitled to protection under §

---

[14] Specifically, the Supreme Court vacated the Third Circuit's holding that Title VII could "be the source of a right asserted in an action brought pursuant to section 1985(3)," while leaving undisturbed its holding that conspiracies resulting from gender-based animus are actionable under § 1985(3). *Lake v. Arnold*, 112 F.3d 682, 686, n. 6 (3d Cir. 1997).

1985(3).

A plaintiff need not necessarily be a member of the class entitled to statutory protection in order to assert a cause of action under § 1985(3). *Scott*, 463 U.S. at 836, 103 S.Ct. at 3360, 77 L.Ed.2d at 1059 ("In the first place, it is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes *and those who championed their cause*, most notably Republicans.") (emphasis added). It suffices for a plaintiff to establish that he or she was injured by conspirators who harbored a class-based animus, regardless of whether the plaintiff is himself or herself a member of the relevant class. *Farber*, 440 F.3d at 141 ("Instead, the legislative history underscores the view that a § 1985(3) plaintiff need not be a member of the class against which a conspiracy directs its invidiously discriminatory animus, even if in practice this is most often the case."). In this case, however, McCleester alleges that he was himself a member of two classes to which Mackel, Rickabaugh, Smolko, Gorsuch and Osborn directed their animus. He alleges that, at the time of the alleged conspiracy, he was "a member of a protected class of Hiram G. Andrews Center's employees with immutable characteristics of suffering from physical infirmities, illnesses, and disabilities." Document No. 18, p. 21, ¶ 125. He also alleges that he was an adult individual over the age of 40, which is recognized as a protected class under the Age Discrimination in Employment Act ("ADEA"). *Id.*, p. 22, ¶ 128; 29 U.S.C. § 631(a). The Court is not convinced that either of these two classes qualify for § 1985(3) protection.

At the outset, it is worth noting that neither age classifications nor classifications based on disability are subjected to a heightened degree of judicial scrutiny for purposes of the Equal Protection Clause. *Board of Trustees v. Garrett*, 531 U.S. 356, 366-368, 121 S.Ct. 955, 963-964, 148 L.Ed.2d 866, 878-880 (2001); *Kimel v. Florida Board of Regents*, 528 U.S. 62, 83-86, 120 S.Ct. 631, 645-647, 145

52

L.Ed.2d 522, 542-544 (2000). That reality, however, is not itself dispositive of the issue. In *Lake*, the Court of Appeals determined that mentally retarded persons constituted a class of persons protected under § 1985(3). *Lake*, 112 F.3d at 685-688. By that time, it was already clear that classifications based on mental retardation were neither suspect nor quasi-suspect classifications for Equal Protection Clause purposes. *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 442-447, 105 S.Ct. 3249, 3255-3258, 87 L.Ed.2d 313, 321-325 (1985). Thus, the Court cannot place singular reliance on the Supreme Court's Equal Protection Clause jurisprudence in determining whether a given class is entitled to protection under § 1985(3).

In *Farber v. City of Paterson*, 440 F.3d 131, 137 (3d Cir. 2006), the Court of Appeals acknowledged that its decision in *Lake* had apparently assumed that "the mentally retarded constitute an objectively identifiable class[.]" In order to determine that a class is protected under § 1985(3), a court must first determine that there is a way to characterize that group of persons as an identifiable segment of the community by reference to some form of objective criteria. *Aulson v. Blanchard*, 83 F.3d 1, 6 (1st Cir. 1996). McCleester does not satisfy this requirement by alleging that the conspiracy against him was "motivated by a discriminatory animus toward people who suffer from physical infirmities, illnesses, and disabilities, even though those people are able to perform the duties of their jobs." Document No. 18, p. 22, ¶ 126. This proposed class is "so subjectively defined and wholly indeterminate that there is simply no way to characterize it as an identifiable segment of the community by reference to any objective criteria[.]" *Farber*, 440 F.3d at 138, quoting *Aulson*, 83 F.3d at 6.

In his brief, McCleester relies on the decision of the United States District Court for the Middle District of Pennsylvania in *Majewski v. Luzerne County*, 2007 WL 1074769, 2007 U.S. Dist. LEXIS 26056 (M.D.Pa. April 9, 2007). Document No. 21, p. 16. In *Majewski*, the District Court construed

the plaintiff's complaint to allege that he was a member of the class of persons protected under the Americans with Disabilities Act ("ADA"), concluding that such a class was protected under § 1985(3). *Majewski*, 2007 WL 1074769, at *7-8, 2007 U.S. Dist. LEXIS 26056, at *20-24. The District Court did not focus on this issue, however, since it concluded that the plaintiff had failed to state a claim under § 1985(3) in any event. *Majewski*, 2007 WL 1074769, at *8, 2007 U.S. Dist. LEXIS 26056, at *25 ("Plaintiff's claim is not that the conspiracy was motivated by a desire to prevent people with disabilities due to back problems from working as prison guards, but out of a desire to prevent him from working due to his disability. Accordingly, plaintiff does not allege a 'discriminatory animus against an identifiable class,' but a discriminatory attitude against him.").

This Court is not convinced that those persons qualifying as "disabled" under the ADA are *ipso facto* entitled to § 1985(3) protection. Although there is some language in *Lake* discussing the plight of disabled persons in a more general sense, the Court of Appeals expressly declined to define the class broadly enough to include individuals who were not mentally retarded. *Lake*, 112 F.3d at 686, n. 5 ("Because the facts of this case do not require us to do so, we decline to define the class protected more broadly to include a wider range of handicaps or the handicapped in general."); see also *Friends & Residents of St. Thomas Township, Inc. v. St. Thomas Development, Inc.*, 176 Fed.Appx. 219, 229 (3d Cir. April 10, 2006) ("The Third Circuit in Lake further *limited* § 1985(3) claims to 'invidious discrimination' predicated on discrimination against individuals with 'immutable characteristics" such as race, gender or *mental* handicap.")(emphasis added); *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 254 (3d Cir. 1999) ("In *Lake*, we held that the mentally retarded are a class protected by § 1985(3), but we expressly declined to make this determination with respect to handicapped persons.").

The question of whether the class of individuals protected under the ADA is entitled to

54

protection under § 1985(3) is a difficult one. Indeed, the very authority relied upon by the Court of Appeals to extend § 1985(3) to gender-based classes would appear to counsel *against* a determination that physically disabled persons are so protected. In *Novotny*, the Court of Appeals relied on the Supreme Court's plurality opinion in *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (plurality opinion), to explain why discrimination against women was particularly invidious. This same line of reasoning would seem to point in the opposite direction with respect to physically disabled persons. *Frontiero*, 411 U.S. at 686, 93 S.Ct. at 1770, 36 L.Ed.2d at 592 ("And what differentiates sex from such nonsuspect statuses as intelligence or *physical disability*, and aligns it with the recognized suspect criteria, is that the sex characteristic frequently bears no relation to ability to perform or contribute to society.")(emphasis added).[15] However, neither *Novotny* nor *Lake* purported to *limit* the classes entitled to statutory protection. *Novotny*, 584 F.2d at 1243; *Lake*, 112 F.3d at 686, n. 5; see also *Farber*, 440 F.3d at 142 ("While we do not hold that discrimination motivated by a mutable characteristic can never be invidious, political affiliation surely does not qualify.").

In any event, the Court need not decide this difficult issue in this case. McCleester defines his proposed class simply as a group of people "who suffer from physical infirmities, illnesses, and disabilities, even though those people are able to perform the duties of their jobs." Document No. 18, p. 22, ¶ 126. He makes no specific reference to the ADA. In order to establish the existence of a disability under the ADA, an individual must show that he or she suffers from "a physical or mental impairment that substantially limits one or more of the major life activities of such individual[.]" 42 U.S.C. § 12102(2). Many individuals who suffer from "physical infirmities" or "illnesses" will not meet this standard. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482, 119 S.Ct. 2139, 2146, 144

---

[15] Of course, this also suggests that claims of mentally handicapped persons would not be cognizable under § 1985(3), yet the Third Circuit has had no problem affording them the statute's protection. *See Lake*, 112 F.3d at 687-88.

L.Ed.2d 450, 462 (1999). Since the Amended Complaint must be construed in the light most favorable to McCleester, the Court acknowledges that his averments concerning his own impairments may meet the ADA's disability standard. Document No. 18, p. 21, ¶¶ 121-125. It does not follow, however, that the same is true for all members of his proposed class. Taking judicial notice of the pleadings in *Majewski*, the Court notes that the plaintiff in that case asserted claims directly under the ADA, and that his complaint could fairly be construed to define class membership for purposes of § 1985(3) by reference to the ADA. MDPA, Civil Action 05-2396, Document No. 9. McCleester makes no reference to the ADA, nor does he explain how membership in his proposed class should be determined. The Court cannot fairly characterize those suffering from physical infirmities, illnesses, and "disabilities" as "an identifiable segment of the community by reference to any objective criteria[.]" *Farber*, 440 F.3d at 138, quoting *Aulson*, 83 F.3d at 6. Therefore, they "cannot serve as a cognizable class within the purview of § 1985(3)."[16] *Id.*

McCleester asserts that the persons protected under the ADEA (i.e., persons who are 40 years of age or older) constitute a class of persons protected under § 1985(3). Document No. 18, p. 22, ¶¶

---

[16] The Court acknowledges that, in *Lake v. Arnold*, 112 F.3d 682, 686-688 (3d Cir. 1997), the United States Court of Appeals for the Third Circuit determined that mentally retarded persons constituted a cognizable class entitled to § 1985(3) protection without establishing particular criteria for determining class membership. If *Lake* were the latest pronouncement from the Court of Appeals on this issue, it may be that the Court would be inclined to view the matter differently. Nevertheless, in *Farber v. City of Paterson*, 440 F.3d 131, 137 (3d Cir. 2006), the Court of Appeals noted that *Lake* had assumed (without much analysis) that the "mentally retarded" constituted an objectively identifiable class of persons. *Lake*, of course, limited the protected class to the mentally retarded, who are only a subset of all disabled persons. *Lake*, 112 F.3d at 686, n. 5. This limitation has been recognized in later decisions. *Ridgewood Board of Education v. N.E.*, 172 F.3d 238, 254 (3d Cir. 1999). It is striking that while the decision in *Lake* was based, in part, on the congressional findings which prompted Congress to enact the ADA, the Court of Appeals chose to limit the protected class to include only the "mentally retarded" rather than to adopt the ADA's own disability standard as the basis for determining class membership. *Lake*, 112 F.3d at 686-688. This limitation in *Lake*'s holding, when viewed in light of the Court of Appeals' subsequent observations about it, causes the Court to question the assumption that persons falling under the protection of the ADA are *ipso facto* entitled to class protection under § 1985(3). Nevertheless, the Court need not reach that issue in this case, since McCleester does not allege that the ADA's disability standard (as opposed to a more indefinite standard based on "physical infirmities, illnesses, and disabilities") should govern the issue of class membership. Document No. 18, p. 22, ¶ 126.

56

128-129; 29 U.S.C. § 631(a). In support of his position, he relies on the decision of the United States District Court for the Eastern District of Pennsylvania in *Carchman v. Korman Corporation*, 456 F.Supp. 730 (E.D.Pa. 1978). Document No. 21, p. 16. In *Carchman*, the District Court apparently assumed that classes protected by federal antidiscrimination laws were *ipso facto* protected under § 1985(3). *Carchman*, 456 F.Supp. at 737. Later decisions of the Court of Appeals, however, counsel against such an assumption. In *Lake*, the Court of Appeals placed specific reliance on the congressional findings associated with the ADA to hold that "mentally retarded" persons (a subset of the "disabled" persons protected under the ADA) were entitled to the special protection available under § 1985(3). *Lake*, 112 F.3d at 686-688. Nevertheless, the Court of Appeals expressly declined the define the class broadly enough to include all "handicapped" persons. *Id.* at 686, n. 5. The ADA, of course, protects more than just the mentally retarded. If the Court of Appeals had been willing to assume that the broader class of persons protected by the ADA *itself* constituted a class of persons entitled to § 1985(3) protection, there would be more force to the reasoning in *Carchman*. Since the Court of Appeals expressly declined to hold that the ADA's disability standard established a class of persons protected under § 1985(3), the Court cannot assume that persons over the age of 40 constitute a cognizable § 1985(3) class simply because the ADEA protects them from age discrimination in the employment context.[17]

McCleester points to no authority aside from *Carchman* to support his argument that persons

---

[17] In *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993), the Supreme Court expressly declined to consider whether women constituted a class of persons protected under § 1985(3). *Bray*, 506 U.S. at 269, 113 S.Ct. at 759, 122 L.Ed.2d at 46 ("Respondents' contention, however, is that the alleged class-based discrimination is directed not at 'women seeking abortion' but at women in general. We find it unnecessary to decide whether *that* is a qualifying class under § 1985(3), since the claim that petitioners' opposition to abortion reflects an animus against women in general must be rejected.") (emphasis in original). There was no assumption that the prohibition against gender discrimination contained in Title VII of the Civil Rights Act of 1964 necessarily meant that women constituted a protected class under § 1985(3). 42 U.S.C. § 2000e-2(a).

over the age of 40 are a class entitled to § 1985(3) protection. Document No. 21, p. 16. The Court is not convinced that such persons constitute a protected class. In *Lake*, the Court of Appeals described disabled persons (including the mentally retarded) as "a group that has traditionally suffered not only physical barriers but the badge of inferiority emplaced by a society that often shuns their presence." *Lake*, 112 F.3d at 688. The same cannot be said of those over the age of 40. The aging process is shared by all people, and only those who die young will remain outside of the category of persons protected under the ADEA. *Kimel*, 528 U.S. at 83, 120 S.Ct. at 645, 145 L.Ed.2d at 542 ("Old age also does not define a discrete and insular minority because all persons, if they live out their normal life spans, will experience it."). Not every class of persons somehow disadvantaged by the realities of everyday life can claim class-based protection under § 1985(3). *See Russo v. Voorhees Township*, 403 F.Supp.2d 352, 359-360 (D.N.J. 2005) (holding that the "impoverished" are not entitled to § 1985(3) protection). The Court notes that the ADEA itself prohibits discrimination on the basis of a forbidden criterion rather than class-based discrimination. *O'Connor v. Consolidated Coin Caterers Corporation*, 517 U.S. 308, 313, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433, 439 (1996) ("Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class."). Moreover, age classifications trigger only a rational basis analysis (and no heightened scrutiny) when challenged under the Equal Protection Clause. *Kimel*, 528 U.S. at 83-86, 120 S.Ct. at 645-647, 145 L.Ed.2d at 542-544. Persons over the age of 40 cannot be fairly characterized as a "discrete and insular minority." *Id.* While members of the proposed class may be easy to identify, it would trivialize the "invidiousness" prong of the *Griffin* test to hold that everyone in United States enters a class protected under § 1985(3) on his or her fortieth

58

birthday.[18]

The Court acknowledges that the parameters for identifying a class protected under § 1985(3) are difficult for both courts and litigants to ascertain. "The best that can be said of § 1985(3) jurisprudence thus far is that it has been marred by fits and starts, plagued by inconsistencies, and left in flux by the Supreme Court." *Trautz v. Weisman*, 819 F.Supp. 282, 291 (S.D.N.Y. 1993). In holding that McCleester fails to allege animus against an identifiable class entitled to statutory protection, the Court does not purport to define the periphery of § 1985(3)'s scope. It suffices to say that the reasoning in the governing precedents counsels against the expansion of § 1985(3) proposed by McCleester, which would bring the statutory provision a few steps closer to being the "general federal tort law" that it was never intended to be. *See Griffin*, 403 U.S. at 102, 91 S.Ct. at 1798, 29 L.Ed.2d at 348. The Defendants' Partial Motion to Dismiss will be granted with respect to Count II of the Amended Complaint.

## CONCLUSION

The Amended Complaint fails to allege personal involvement on the part of Mackel, Rickabaugh, Smolko, Gorsuch, Osborn, Rullman, Yeager and Gannon with respect to the

---

[18] In *Campbell v. West Pittston Borough*, 2006 WL 1892709, at *4, 2006 U.S. Dist. LEXIS 46397, at *10 (M.D.Pa. July 10, 2006), the United States District Court for the Middle District of Pennsylvania noted that the United States Court of Appeals for the Third Circuit has not determined whether the class of persons protected under the ADEA (i.e., persons 40 years of age and older) constitute a class entitled to § 1985(3) protection. The District Court did not reach this issue, since the plaintiff failed to allege a conspiracy motived by "class-based discriminatory animus." *Campbell*, 2006 WL 1892709, at *4, 2006 U.S. Dist. LEXIS 46397, at *10. McCleester satisfies this requirement by alleging that Mackel, Rickabaugh, Smolko, Gorsuch and Osborn were motivated by "a discriminatory animus toward people who are older than the age of 40, even though those people are able to perform the duties of their jobs." Document No. 18, p. 22, ¶ 129. Thus, the question of whether those protected under the ADEA constitute a protected class for purposes of § 1985(3) is squarely before the Court in this case. McCleester also alleges that the five conspirators were "motivated by a discriminatory animus toward people who suffer from physical infirmities, illnesses, and disabilities, even though those people are able to perform the duties of their jobs." *Id.*, ¶ 126. The Court acknowledges the Defendants' argument that these averments contradict other averments in the Amended Complaint, which appear to allege that the conspirators had different motives for their actions. Document No. 20, pp. 18-19. Nevertheless, construing the Amended Complaint in the light most favorable to McCleester, the Court assumes that he alleges that the conspirators acted pursuant to a myriad of different motives.

unconstitutional manner in which the fact-finding meeting of June 1, 2004, was conducted. The Court will therefore grant the Defendants' Partial Motion to Dismiss as to these eight individuals with respect to Count I, Part I, of the Amended Complaint. Such claims can proceed only against Wildeman and Sariano.

Because no factual averments link Mackel or Sariano to the Petition Clause violations alleged in the Amended Complaint, Count I, Part II, will be dismissed as to them. To the extent that Rickabaugh, Smolko, Gorsuch and Osborn are alleged to have violated the Petition Clause, they did not act under color of Pennsylvania law. Consequently, the Partial Motion to Dismiss will be granted as to Count I Part II, with respect to these four individuals as well. McCleester may pursue his Petition Clause claims against Wildeman, Gannon, Rullman and Yeager.

Count I, Part III, of the Amended Complaint will be dismissed in its entirety, since McCleester fails to properly allege that he was deprived of a constitutionally protected interest in his reputation without due process of law.

Since the Amended Complaint properly alleges violations of the Equal Protection Clause resulting from a conspiracy formed by Mackel, Rickabaugh, Smolko, Gorsuch and Osborn, the Partial Motion to dismiss will be denied with respect to all of Count III and the equal protection portion of Count I, Part IV. Count I, Part IV also contains claims of conspiracy to violate Plaintiff's "procedural due process rights; his First Amendment rights; [and] his liberty interest in his reputation . . . ." Document No. 18 p. 18 ¶ 107. As the Court has already dismissed individual procedural due process and First Amendment claims against Mackel, Rickabaugh, Smolko, Gorsuch and Osborn, and liberty interest claims against all Defendants, the Court will likewise dismiss the procedural due process, First Amendment, and liberty interest portions of Count I, Part IV.

60

Given that McCleester fails to allege that the conspiracy entered into by Mackel, Rickabaugh, Smolko, Gorsuch and Osborn was motivated by a discriminatory animus against a class of persons entitled to § 1985(3) protection, the Court will grant the Defendants' Partial Motion to Dismiss with respect to Count II. An appropriate order follows.

## ORDER

**AND NOW**, this 27th day of March, 2008, the Court having considered Defendants' partial Motion to Dismiss Amended Complaint, (Document No. 19), for the reasons stated in the foregoing memorandum opinion **IT IS HEREBY ORDERED** that the motion is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** as follows:

1.  **Count I, Part I** of the Amended Complaint, (Document No. 18), is **DISMISSED** as to Defendants Mackel, Rickabaugh, Smolko, Gorsuch, Osborn, Rullman, Yeager and Gannon. Claims under **Count I, Part I** of the Amended Complaint may proceed only against Defendants Wildeman and Sariano.

2.  **Count I, Part II** of the Amended Complaint, (Document No. 18), is **DISMISSED** as to Defendants Mackel, Sariano, Rickabaugh, Smolko, Gorsuch and Osborn. Claims under **Count I, Part II** of the Amended Complaint may proceed only against Wildeman, Gannon, Rullman and Yeager.

3.  **Count I, Part III** of the Amended Complaint, (Document No. 18), is **DISMISSED** in its entirety.

4.  **Count I, Part IV** of the Amended Complaint, (Document No. 18), is **DISMISSED** as

61

to the claims involving procedural due process, the First Amendment, and Plaintiff's liberty interest in his reputation. Plaintiff's equal protection claim under **Count I, Part IV** of the Amended Complaint may proceed against Mackel, Rickabaugh, Smolko, Gorsuch and Osborn only.

5.    **Count II** of the Amended Complaint, (Document No. 18), is **DISMISSED** in its entirety.

6.    As to **Count III** of the Amended Complaint, (Document No. 18), Defendant's Partial Motion to Dismiss, (Document No. 19), is **DENIED**. Claims under **Count III** of the Amended Complaint may proceed against Defendants Mackel, Rickabaugh, Smolko, Gorsuch, Wildeman, Osborn, Rullman, Yeager, Gannon and Sariano, with the understanding that Rickabaugh, Smolko, Gorsuch and Osborn acted under color of state law only insofar as their actions were pursuant to their alleged conspiracy with Mackel.

BY THE COURT:

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

cc:    Mary Lynch Friedline, Esq.
       Vincent J. Barbera, Esq.
       Nathaniel A. Barbera, Esq.